_____

95-3441
_____

Gaming Corporation of America;      *
Golden Nickel Casinos, Inc.,        *
                                    *
       Plaintiffs/Appellees,        *
                                    *   Appeal from the United States
       v.                           *   District Court for the
                                    *   District of Minnesota
Dorsey & Whitney, a partnership,    *
                                    *
       Defendant/Appellant.         *


_____

95-3696
_____

In re: Dorsey & Whitney,            *
a partnership,                      *
                                    *   Petition for Writ of Mandamus
       Petitioner.                  *
                                    *


_____

                 Submitted:   January 10, 1996

                   Filed:  June 27, 1996
_____

Before LOKEN, HANSEN, and MURPHY, Circuit Judges.
_____

MURPHY, Circuit Judge.

     Gaming Corporation of America (Gaming Corp.) and Golden Nickel
Casinos, Inc. (Golden Nickel) sued the Dorsey & Whitney law firm (Dorsey)
in state court, alleging that Dorsey had violated state and federal law
while representing a Native American tribe during

a tribal casino management licensing process.  Dorsey removed the case to federal district court, which remanded to the state court after dismissing several causes of action and concluding that no federal questions remained. Dorsey seeks review either by a petition for a writ of mandamus or by appeal, on the basis that federal questions remain and that the Indian Gaming Regulation Act (IGRA), 25 U.S.C. §§ 2701 et seq., completely preempts the field of Indian gaming regulation.

I.

Gaming Corp. and Golden Nickel (the management companies) are Minnesota corporations involved in the management of gambling casinos. They have overlapping ownership and at one point agreed to merge.  Dorsey is a large Minnesota law firm which actively represented Gaming Corp. for some time.

The Ho-Chunk Nation is a recognized Native American tribe in Wisconsin and was known as the Wisconsin Winnebago Tribe until 1994.  The nation decided to open a casino and negotiated a tribal-state compact with the state of Wisconsin in 1992 as required by IGRA to allow it to conduct casino gaming.  The nation desired to have Dorsey represent it during the process of developing the casino, and Golden Nickel hoped to receive the contract to manage it.

Dorsey had been representing Gaming Corp. but wished to begin representing the tribe.  Since the management companies had overlapping ownerships, Dorsey wrote to the nation and Golden Nickel advising them of the possibility that the interests of the nation could be adverse to those of Golden Nickel and requesting their permission to represent the nation. The letter contained assurances that Dorsey would disclose no confidential information gained from its representation of Gaming Corp.  In February 1992 Golden Nickel and the nation both consented to Dorsey's

representation of the nation,[1] and in July of that year Dorsey became special counsel to the nation under a contract approved by the Bureau of Indian Affairs. Dorsey states it ended its representation of Gaming Corp. in April 1993.

On October 7, 1992 Golden Nickel and the nation entered into an agreement under which Golden Nickel would manage the Ho-Chunk Casino to be constructed in Baraboo, Wisconsin. Golden Nickel was to provide financing for the construction and to maintain at all times a valid license from the Winnebago Gaming Commission, the nation's regulatory body for gaming. Golden Nickel obtained a provisional license from the tribal gaming commission in May 1993, which was valid until the end of that year. The agreement also required Gaming Corp. to obtain a license if the management companies merged as they proposed. The casino was built and began operating.

In December 1993 Golden Nickel applied for a permanent license, and several months later Gaming Corp. also applied for a license. The management companies apparently planned to merge if both applications were approved. Dorsey assisted the tribal gaming commission in assessing the applications and was in charge of presenting evidence at several commission hearings held from December 1993 through May 1994.

After receiving the evidence, the tribal gaming commission denied the applications of both Gaming Corp. and Golden Nickel. The commission concluded that the individuals who owned all of Golden Nickel and much of Gaming Corp. had violated the terms of the provisional license. It found that one of the individuals had improperly attempted to influence a member of the nation's business

---

[1]Two of the three individuals who signed the agreement on behalf of Golden Nickel also had an ownership interest in Gaming Corp.

committee[2] to secure permanent license approval and that the testimony of the owners of the management companies was often contradictory and not credible. It also found that the management companies had failed to sever ties with certain individuals as required by the provisional license. The permanent license applications were denied in July 1994, and the management contract was terminated since Golden Nickel could not continue to operate the Ho-Chunk Casino without a license.

The management companies appealed the tribal commission's decision in the nation's courts and also brought suit against several parties in Wisconsin state court. On February 9, 1995, the management companies and the nation reached a settlement of their disputes. The nation agreed to pay the management companies $42 million in exchange for a release of all claims and for land controlled by the companies.[3]

Meanwhile, the management companies filed this action against Dorsey in Minnesota state court on September 17, 1994. The complaint, and the amended complaint filed less than a week later, contained eleven counts. The management companies alleged numerous common law violations. The thrust of these counts was that Dorsey had made the licensing process unfair by intentionally or negligently making the management companies appear unsuitable. Dorsey allegedly used fraudulent and harassing tactics after having represented that the licensing process would be a mere formality. Several counts also alleged that Dorsey had violated a fiduciary duty owed to the management companies arising out of its

---

[2]Before changing its name to the Ho-Chunk Nation in 1994, the tribe's highest governing body was the Winnebago Business Committee. The Winnebago Gaming Commission was subordinate to the business committee.

[3]Part of the payment was for the purchase of land adjacent to the casino used for parking. This land was owned by Dells Development Corp., a wholly owned subsidiary of Gaming Corp.

representation of Gaming Corp. Count IX alleged that Dorsey had violated the Indian Civil Rights Act, 25 U.S.C. § 1302. The management companies claimed damage in excess of $100 million.

Dorsey removed the case to federal court in October 1994. Its amended notice of removal stated that the complaint raised federal questions since many of the allegations related to gaming license proceedings governed by IGRA and since count IX arose under the Indian Civil Rights Act. Dorsey moved to dismiss the complaint in November on the basis that the management company causes of action were completely preempted by IGRA and that count IX did not state a claim because no private right of action exists under the Indian Civil Rights Act. On the same day the management companies moved to remand to state court.

In April 1995 the management companies were allowed to file a second amended complaint. Count IX was amended to allege a conspiracy to violate the Indian Civil Rights Act. Counts XII and XIII were added, alleging violations of the management companies' due process rights under the fourteenth and fifth amendments to the United States Constitution.

On August 30, 1995 the district court issued an order dismissing some claims and remanding the remainder to state court. As a threshold matter it concluded that state law is not completely preempted by IGRA. It dismissed for failure to state a claim the due process allegations in counts XII and XIII and portions of two counts alleging Dorsey's breach of a duty of good faith and fair dealing under IGRA. After concluding that the count IX conspiracy related to the Indian Civil Rights Act arose under state law and that no federal causes of action remained, it declined to exercise supplemental jurisdiction and remanded under 28 U.S.C. § 1367(c)(3).

Dorsey then petitioned for a writ of mandamus and also filed

an appeal because of uncertainty about the proper procedure to obtain review. Dorsey argues that the district court had no discretion to remand the case since IGRA completely preempts state law, that all alleged causes of action arise under federal law but fail to state a claim upon which relief can be granted, and that all claims should therefore be dismissed.

## II.

The management companies argue that this court does not have jurisdiction to consider the issues raised, either on appeal or on a petition for a writ of mandamus. In support of their position they point out that 28 U.S.C. § 1447(d) bars appellate review when a case is remanded because of improper removal or because the federal court lacks subject matter jurisdiction.

Section 1447(d) provides that an order of remand is not reviewable unless the case was removed under § 1443, the federal civil rights removal statute. This broadly stated restriction has been construed narrowly, however, and the Supreme Court has explained that only cases remanded under 28 U.S.C. § 1447(c) are subject to this nonreviewability provision.[4] Quackenbush v. Allstate Insurance Company, 116 S. Ct. 1712, _____, 1996 WL 287700

---

[4]The relevant portions of 28 U.S.C. § 1447 read:

> (c) A motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. . . .

> (d) An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1443 of this title shall be reviewable by appeal or otherwise.

at \*4, \*7 (U.S., June 3, 1996); <u>Thermtron Products, Inc. v. Hermansdorfer</u>, 423 U.S. 336, 346 (1976). This case was not remanded under 28 U.S.C. § 1447(c), so 1447(d) does not bar review by an appellate court.

Count IX of the original complaint alleged a violation of the Indian Civil Rights Act, 25 U.S.C. § 1302,[5] so the district court had federal question jurisdiction at the time of removal apart from the claimed complete preemption by IGRA. The district court explicitly remanded the case under 28 U.S.C. § 1367(c)(3) after concluding no federal claims remained and declining to exercise supplemental jurisdiction.[6] <u>Gaming Corporation of America and Golden Nickel Casinos, Inc. v. Dorsey & Whitney</u>, No. 4-94-1036, slip op. at 15 (D.Minn. Aug. 30, 1995). Because the district court never lacked subject matter jurisdiction and remanded under § 1367, neither § 1447(d) nor any other statutory bar exists to our jurisdiction. <u>See</u> <u>In re Burns & Wilcox, Ltd.</u>, 54 F.3d 475, 477 & n.7 (8th Cir. 1995); <u>Melahn v. Pennock Insurance Inc.</u>, 965 F.2d 1497, 1500-01 (8th Cir. 1992).

The question remains whether this case should be considered on appeal or on the petition for a writ of mandamus. Prior to the

----

[5]Count IX was later amended after removal to allege a conspiracy to violate the Indian Civil Rights Act. <u>See</u> <u>infra</u>.

[6]Several cases relied on heavily by the management companies involve situations in which district courts decided claims were not preempted and remanded under 28 U.S.C. § 1447(c); removal was improper, and remand orders were unreviewable under § 1447(d). <u>See, e.g.</u>, <u>Nutter v. Monongahela Power Co.</u>, 4 F.3d 319 (4th Cir. 1993); <u>Baldridge v. Kentucky-Ohio Transportation, Inc.</u>, 983 F.2d 1341, 1350 (6th Cir. 1993) (concluding that the district court had remanded under 28 U.S.C. § 1447(c); <u>Soley v. First National Bank of Commerce</u>, 923 F.2d 406 (5th Cir. 1991); <u>Hansen v. Blue Cross of California</u>, 891 F.2d 1384, 1387-88 (9th Cir. 1989); <u>Whitman v. Raley's Inc</u>, 886 F.2d 1177, 1180-82 (9th Cir. 1989). In this case there was no § 1447(c) remand, so § 1447(d) does not bar review. <u>Thermtron Products, Inc. v. Hermansdorfer</u>, 423 U.S. 336, 346 (1976).

recent decision by the Supreme Court in Quackenbush v. Allstate Insurance Company, 116 S. Ct. 1712, 1996 WL 287700 (U.S., June 3, 1996), this court had indicated that review of remand orders should be by way of mandamus. In re Burns & Wilcox, Ltd., 54 F.3d 475, 477 & n.7 (8th Cir. 1995). That was because Thermtron appeared to prevent an appeal of a remand order under the collateral order exception to the final judgment rule. Id.

In Quackenbush the Supreme Court disavowed Thermtron to the extent that case appeared to conflict with the holding in Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 11-13 (1983). 116 S. Ct. at ____, 1996 WL 287700 at *7. Because the remand order under review in Quackenbush "is functionally indistinguishable" from the stay order in Moses H. Cone, it should be appealable. Id. The remand "put the litigants 'effectively out of court,'" and "its effect was 'precisely to surrender jurisdiction of a federal suit to a state court.'" Id. at *5 (quoting Moses H. Cone, 460 U.S. at 11, n.11). The remand order also would not be able to be reviewed on appeal at some later time. Id. at *6.

The effect of the district court's remand in this case is identical to that of the order reviewed in Quackenbush and "clearly more 'final'" than the stay order in Moses H. Cone. Id. By remanding under 28 U.S.C. § 1367(c), the district court surrendered jurisdiction to the state court, and Dorsey would have no other opportunity to appeal that decision in a federal court. The district court "disassociate[d] itself from the case entirely, retaining nothing of the matter on the federal court's docket." Id. The appropriate procedure then is to dismiss Dorsey's petition for a writ of mandamus and undertake our review by way of the appeal.

III.

Dorsey argues that the district court abused its discretion by remanding the remaining claims to state court. It contends that IGRA completely preempts state law and that all of the management company claims therefore arise under federal law. The management companies respond that IGRA is not completely preemptive and the case was properly remanded.

A district court has no discretion to remand a claim that states a federal question. In re City of Mobile, 75 F.3d 605, 607 (11th Cir. 1996); Borough of West Mifflin v. Lancaster, 45 F.3d 780, 787 (3rd Cir. 1995); Burks v. Amerada Hess Corp., 8 F.3d 301, 304 (5th Cir. 1993). The existence of a federal question is an issue of law which we review de novo.

A.

As a general rule a plaintiff can avoid removal to federal court by alleging only state law claims. Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987). The "well-pleaded complaint rule" requires that a federal cause of action must be stated on the face of the complaint before the defendant may remove the action based on federal question jurisdiction. Id. A federal defense, including the defense that one or more claims are preempted by federal law, does not give the defendant the right to remove to federal court. Id. at 392-93.

Complete preemption provides an exception to the well-pleaded complaint rule and is different from preemption used only as a defense. Complete preemption can arise when Congress intends that a federal statute preempt a field of law so completely that state law claims are considered to be converted into federal causes of action. Metropolitan Life Insurance Co. v. Taylor, 481 U.S. 58, 65 (1987); Avco Corp. v. Aero Lodge No. 735, Intern. Ass'n of Machinists and Aerospace Workers, 390 U.S. 557 (1968). To be completely preemptive, a statute must have "extraordinary

pre-emptive power," a conclusion courts reach reluctantly.  Metropolitan Life, 481 U.S. at 65.  The term "complete preemption" is somewhat misleading because even when it applies, all claims are not necessarily covered.

Only those claims that fall within the preemptive scope of the particular statute, or treaty, are considered to make out federal questions, see Metropolitan Life, 481 U.S. at 64-66, but the presence of even one federal claim gives the defendant the right to remove the entire case to federal court.  28 U.S.C. § 1441.  Complete preemption therefore has jurisdictional consequences that distinguish it from preemption asserted only as a defense.  The defense of preemption can prevent a claim from proceeding, but in contrast to complete preemption it does not convert a state claim into a federal claim.

In Metropolitan Life, the Supreme Court extended the doctrine of complete preemption to actions under § 502(a) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a).  481 U.S. 58.  Prior to Metropolitan Life, the Supreme Court had recognized complete preemption in § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, Avco Corp. v. Aero Lodge No. 735, Intern. Ass'n of Machinists and Aerospace Workers, 390 U.S. 557 (1968), and in the possessory interest of Native American tribes to lands obtained by treaty, Oneida Indian Nation of New York State v. County of Oneida, N.Y., 414 U.S. 661 (1974) (considered a complete preemption case by the Supreme Court; see Caterpillar, 482 U.S. at 393 n.8).[7]  This court has also found complete preemption in other

_____

[7]The Oneida Nation had sued the state of New York, seeking the rental value of properties allegedly ceded to the state without the consent of the United States.  The lower federal courts concluded that the action was for possession of real property under state law.  The Supreme Court reversed, reasoning that the ultimate issue of possession stated a federal question because its resolution would require sufficient reference to the treaties and laws of the United States.  Oneida Indian Nation of New York State v. County of Oneida, N.Y., 414 U.S. 661, 675 (1974).  In reaching its conclusion, the Court considered the history of the unique possessory interests of Indians and the requirement that the

areas of special federal interest.  See Peters v. Union Pacific Railroad Co., No. 95-1599 (8th Cir. April 1, 1996) (Federal Railroad Safety Act, 45 U.S.C. § 434); Deford v. Soo Line Railroad Co., 867 F.2d 1080 (8th Cir.) (Railway Labor Act, as amended, 45 U.S.C. § 151 et seq.), cert. denied, 492 U.S. 927 (1989).

This apparently is the first time a federal appellate court has been asked to consider whether IGRA completely preempts state laws regulating gaming on Indian lands,[8] but a number of federal courts have noted the strong preemptive force of IGRA.[9]  See, e.g., Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 63 F.3d 1030 (11th Cir. 1995) ("The occupation of this field by [IGRA] is evidenced by the broad reach of the statute's regulatory and enforcement provisions and is underscored by the comprehensive regulations promulgated under the statute."); Cabazon Band of Mission Indians v. Wilson, 37 F.3d 430, 433-35 (9th Cir. 1994)

---

United States approve transfers of Indian lands.  Id. at 667-74.

[8]At least one district court has been faced with the issue. In State of Kansas ex rel. Stephan v. Finney, 1993 WL 192809 (D.Kan. 1993), the state attorney general sued to determine whether Class III gaming was prohibited under Kansas law. Governor Finney, who had negotiated a tribal-state compact with two tribes, removed the action to federal court, claiming that IGRA completely preempted state law.  Although the district court seemed to conclude that IGRA is completely preemptive, it decided that whether a state permits Class III gaming is a question of state law, resolvable without reference to IGRA and therefore outside the scope of any preemption.

[9]Courts have also remarked on IGRA's comprehensive nature. See, e.g., Sycuan Band of Mission Indians v. Roache, 54 F.3d 535, 538 (9th Cir. 1994), cert. denied, 116 S.Ct. 297 (1995); Forest County Potawatomi Community of Wisconsin v. Norquist, 45 F.3d 1079, 1082 (7th Cir. 1995); Ponca Tribe of Oklahoma v. State of Oklahoma, 37 F.3d 1422, 1425 (10th Cir. 1994), vacated on other grounds, 116 S.Ct. 1410 (1996).

(IGRA preempts state license fee based on wagers at Indian gaming facility).

The methodology used in Metropolitan Life to determine whether there was complete preemption is useful in guiding our analysis. There the Supreme Court considered the text of ERISA, congressional committee reports, and the statements of a sponsor on the Senate floor before concluding that § 502(a) completely preempts state law. 481 U.S. at 65-66. Congressional intent is the "ultimate touchstone" guiding preemption analysis. Pilot Life Insurance Co. v. Dedeaux, 481 U.S. 41, 45 (1987) (citations omitted).

Examination of the text and structure of IGRA, its legislative history, and its jurisdictional framework likewise indicates that Congress intended it completely preempt state law. There is a comprehensive treatment of issues affecting the regulation of Indian gaming. One of the stated purposes of IGRA is "the establishment of Federal standards for gaming on Indian lands." 25 U.S.C. § 2702(3). The statute also declares that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5). IGRA establishes a federal National Indian Gaming Commission (NIGC) to oversee regulation, licensing, background checks of key employees, and other facets of gaming. The NIGC can approve or disapprove license applications, management contracts, and tribal gaming ordinances. It can suspend gaming, impose fines, perform its own background checks of individuals, and request the aid of other federal agencies. The commission also has a broad grant of regulatory authority.

The statute classifies all gaming into three categories and places traditional (class I) gaming entirely beyond the reach of both federal and state regulation. 25 U.S.C. § 2710(a)(1). States

can influence class II gaming on Indian lands within their borders only if they prohibit those games for everyone under all circumstances. 25 U.S.C. § 2710(b)(1)(A). Short of a complete ban, states have virtually no regulatory role in class II gaming. 25 U.S.C. § 2710(b)(4); see United States v. Sisseton-Wahpeton Sioux Tribe, 897 F.2d 358, 364 (8th Cir. 1990); see also Oneida Tribe of Indians of Wisconsin v. State of Wisconsin, 951 F.2d 757, 759 (7th Cir. 1991).

At no point does IGRA give a state the right to make particularized decisions regarding a specific class II gaming operation. States only may set the minimum licensing criteria for operators of class II facilities and impose some limitations on card parlor games. See 25 U.S.C. §§ 2703(7)(A)(ii), 2710(b)(4). The statute itself reveals a comprehensive regulatory structure for Indian gaming. The only avenue for significant state involvement is through tribal-state compacts covering class III gaming.

The legislative history contains a strong statement about IGRA's preemptive force. The Senate committee report stated that "S. 555 is intended to expressly preempt the field in the governance of gaming activities on Indian lands. Consequently, Federal courts should not balance competing Federal, State, and tribal interests to determine the extent to which various gaming activities are allowed." S.Rep. No. 446, 100th Cong., 2d Sess. 6 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3076. Although the Senate committee did not refer to the complete preemption doctrine, cf. Metropolitan Life, 481 U.S. at 65-66, this statement demonstrates the intent of Congress that IGRA have extraordinary preemptive power, both because of its broad language and because it demonstrates that Congress foresaw that it would be federal courts which made determinations about gaming.

When Congress has chosen explicitly to grant jurisdiction to federal courts within a substantive statutory scheme, there may be

special significance in terms of complete preemption. In <u>Metropolitan Life</u>, the Court compared ERISA's jurisdictional provision to that of § 301 of the LMRA, the first statute found to be completely preemptive. 481 U.S. at 65; <u>see</u> <u>Avco</u>, 390 U.S. 557 (1968). Section 301 provides that suits "may be brought in any district court of the United States having jurisdiction of the parties . . . ." 29 U.S.C. § 185(a). Section 502(f) of ERISA reads:

> The district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the citizenship of the parties, to grant the relief provided for in [§ 502(a), 29 U.S.C. § 1132(a)] in any action.

29 U.S.C. § 1132(f). Both of these statutes provide for actions in federal court, and both were found to be completely preemptive.

Every reference to court action in IGRA specifies federal court jurisdiction. 25 U.S.C. §§ 2710(d)(7)(A),[10] 2711(d), 2713(c), 2714, 2715(c). State courts are never mentioned. The broadest jurisdictional provision of IGRA specifically provides for appeal of final National Indian Gaming Commission decisions to "the appropriate Federal district court," and covers the most substantive functions of the commission, including imposing civil penalties and approving of tribal gaming ordinances and management contracts. 25 U.S.C. § 2714. As in <u>Metropolitan Life</u> and <u>Avco</u>, Congress apparently intended that challenges to substantive decisions regarding the governance of Indian gaming would be made in federal courts.

IGRA's exclusive focus on federal courts may also be viewed within the larger jurisdictional framework of Indian law. When

---

[10]The Supreme Court recently held this subsection unconstitutional under the eleventh amendment. The subsection allowed tribes to sue states in federal court in order to encourage states to negotiate compacts. <u>See</u> <u>Seminole Tribe of Florida v. Florida</u>, 116 S. Ct. 1114 (1996).

drafting IGRA, Congress recognized the unique history of federal and state jurisdiction over Native Americans and Indian country. The Senate committee stated:

> It is a long- and well-established principle of Federal-Indian law as expressed in the United States Constitution, reflected in Federal statutes, and articulated in decisions of the Supreme Court, that unless authorized by an act of Congress, the jurisdiction of State governments and the application of state laws do not extend to Indian lands. In modern times, even when Congress has enacted laws to allow a limited application of State law on Indian lands, the Congress has required the consent of tribal governments before State jurisdiction can be extended to tribal lands.

S.Rep. No. 446, 100th Cong., 2d Sess. 5 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3075.

The legislative history indicates that Congress did not intend to transfer any jurisdictional or regulatory power to the states by means of IGRA unless a tribe consented to such a transfer in a tribal-state compact.

> Consistent with these principles, the Committee has developed a framework for the regulation of gaming activities on Indian lands which provides that in the exercise of its sovereign rights, unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities.

> The mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of State jurisdiction and the application of state laws to activities conducted on Indian land is a tribal-State compact. In no instance, does S. 555 contemplate the extension of State jurisdiction or the application of State laws for any other purpose. Further, it is the Committee's intention that to the extent tribal governments elect to relinquish rights in a tribal-State compact that they might have otherwise reserved, the relinquishment of such rights shall be specific to the tribe so making the election, and shall not be construed to extend to other tribes, or as a general abrogation of other reserved rights or of tribal sovereignty.

S.Rep. No. 446, 100th Cong., 2d Sess. 5-6 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3075-76.

Congress thus left states with no regulatory role over gaming except as expressly authorized by IGRA, and under it, the only method by which a state can apply its general civil laws to gaming is through a tribal-state compact. Tribal-state compacts are at the core of the scheme Congress developed to balance the interests of the federal government, the states, and the tribes. They are a creation of federal law, and IGRA prescribes "the permissible scope of a Tribal-State compact, see § 2710(d)(3)(C)." Seminole Tribe of Florida v. Florida, 116 S. Ct. 1114, 1120 (1996). Such compacts must also be approved by the Secretary of the Interior. § 2710(d)(3)(B).

A relevant factor to consider regarding the intent of Congress is the effect of California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987), on the final form of IGRA. S.Rep. No. 446, 100th Cong., 2d Sess. 4 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3073-74; see also Cheyenne River Sioux Tribe v. State of South Dakota, 3 F.3d 273, 275 (8th Cir. 1993). In Cabazon, the Supreme Court had concluded that California could not apply its own laws regulating bingo prize limits and card games to Indian gaming because the relevant interests of the tribes and the federal government outweighed the state's regulatory interest. 480 U.S. 202. Indian sovereignty, self-sufficiency, and self-government were the "important federal interests" discussed. Id. at 216-20. The state's major interest was discouraging organized crime. After balancing these interests, the Court reasoned that "State regulation would impermissibly infringe on tribal government." Id. at 215, 222.[11]

_____

[11]The Court acknowledged, however, that had California prohibited bingo instead of regulating it, state criminal law would have been applied. (Under Pub.L. 280 several states, including California and Wisconsin, were given criminal jurisdiction over
some or all of the Indian lands within their borders. 18 U.S.C. § 1162.)

-16-

IGRA incorporated <u>Cabazon's</u> distinction between prohibition and regulation, <u>see</u> <u>United States v. Sisseton-Wahpeton Sioux Tribe</u>, 897 F.2d 358 (8th Cir. 1990), but rather than directing the federal courts to perform the balancing of interests between the state on the one side and the tribe and federal government on the other, Congress conducted the balancing itself. S.Rep. No. 446, 100th Cong., 2d Sess. 6 (1988), <u>reprinted in</u> 1988 U.S.C.C.A.N. 3071, 3076. It divided gaming into three separate classes, allowed states to prohibit class II and class III gaming if those activities were prohibited throughout a state, and required a tribal-state compact for class III gaming.

The legislative history reveals the intent of Congress in setting up this tripartite scheme and in considering state, tribal, and federal interests:

> [I]n the final analysis, it is the responsibility of the Congress, consistent with its plenary power over Indian affairs, to balance competing policy interests and to adjust, where appropriate, the jurisdictional framework for regulation of gaming on Indian lands. S. 555 recognizes primary tribal jurisdiction over bingo and card parlor operations although oversight and certain other powers are vested in a federally established National Indian Gaming Commission. For class III casino, parimutuel and slot machine gaming, the bill authorizes tribal governments and State governments to enter into tribal-State compacts to address regulatory and jurisdictional issues.

S.Rep. No. 446, 100th Cong., 2d Sess. 3 (1988), <u>reprinted in</u> 1988 U.S.C.C.A.N. 3071, 3073.

Congress thus chose not to allow the federal courts to analyze the relative interests of the state, tribal, and federal governments on a case by case basis. Rather, it created a fixed division of jurisdiction. If a state law seeks to regulate gaming,

it will not be applied.  If a state law prohibits a class of gaming, it may have force.  The courts are not to interfere with this balancing of interests, they are not to conduct a Cabazon balancing analysis.  This avoids inconsistent results depending upon the governmental interests involved in each case.  With only the limited exceptions noted above, Congress left the states without a significant role under IGRA unless one is negotiated through a compact.

The compact here between the nation and the state of Wisconsin adopts the statutory pattern of jurisdiction.  The major jurisdictional provision reads:  "This Compact does not change the allocation of civil jurisdiction among federal, state, and tribal courts, unless specifically provided otherwise in the Compact."  Winnebago/State of Wisconsin Gaming Compact of 1992 at 36 (Joint Appendix at 158).

The issue of whether complete preemption exists is separate from the issue of whether a private remedy is created under a federal statute.  Caterpillar Inc. v. Williams, 482 U.S. 386, 391 n.4 (1987).  Complete preemption can sometimes lead to dismissal of all claims in a case.  Although courts may be reluctant to conclude that Congress intended plaintiffs to be left without recourse, see M. Nahas & Co., Inc. v. First National Bank of Hot Springs, 930 F.2d 608, 612 (8th Cir. 1991), the intent of Congress is what controls.  Pilot Life Insurance Co. v. Dedeaux, 481 U.S. 41, 45 (1987) (citations omitted).  IGRA has a carefully balanced jurisdictional scheme, through which Congress gave the states the right to negotiate tribal-state compacts but declined to grant them broader authority without tribal consent.

The statute itself and its legislative history show the intent of Congress that IGRA control Indian gaming and that state regulation of gaming take place within the statute's carefully defined structure.  We therefore conclude that IGRA has the

-18-

requisite extraordinary preemptive force necessary to satisfy the complete preemption exception to the well-pleaded complaint rule.

B.

The conclusion that IGRA completely preempts state law is reenforced when the statute is viewed in the context of Indian law.  "The traditional notions of Indian sovereignty provide a crucial 'backdrop' against which any assertion of state authority must be assessed."  White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143 (1980) (citation omitted).  A long line of Supreme Court decisions illustrates the importance of the federal and tribal interests in Indian cases and the authority of Congress to protect those interests.

Congress has "plenary and exclusive power . . . to deal with Indian tribes."  Bryan v. Itasca County, Minnesota, 426 U.S. 373, 376 n.2 (1976); see also Morton v. Mancari, 417 U.S. 535, 551-52 (1974) (plenary power is "drawn both explicitly and implicitly" from the Indian Commerce Clause, U.S. Const. Art. I, § 8, cl. 3, and the President's treaty power, U.S. Const. Art. II, § 2, cl. 2); United States v. Sioux Nation of Indians, 448 U.S. 371, 413 (1980) ("Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, . . .") (quoting Lone Wolf v. Hitchcock, 187 U.S. 553, 565 (1903)).[12]

---

[12]Early in its history the Supreme Court determined that states did not have jurisdiction over Indian lands unless jurisdiction were affirmatively granted by Congress.  For example, in Worcester v. Georgia, 31 U.S. 515, 6 Pet. 515, 560 (U.S. 1832), the Court remarked on the

> universal conviction that the Indian nations possessed a full right to the lands they occupied, until that right should be extinguished by the United States, with their consent:  that their territory was separated from that of any state within whose chartered limits they might reside, by a boundary line, established by treaties: that, within their boundary, they possessed rights with

which no state could interfere: and that the whole power of regulating intercourse with them, was vested in the United

Principles of Indian sovereignty and jurisdiction have developed and changed over time, but the Supreme Court very recently reaffirmed that Indian commerce is "under the exclusive control of the Federal Government." Seminole Tribe of Florida v. Florida, 116 S.Ct. 1114, 1131 (1996). Native Americans are entitled to the benefit of the doubt if legislation is ambiguous. "[S]tatutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians." Bryan, 426 U.S. at 392.

Because of unique federal and tribal interests a less stringent test is applied when preemption is asserted as a defense in cases involving Indian affairs. New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 334 (1983). In non-Indian cases the intent of Congress is the "touchstone" of the analysis, but because of "'[t]he unique historical origins of tribal sovereignty' and the federal commitment to tribal self-sufficiency and self-determination," id., express congressional intent is not required in the context of Indian affairs:

> State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority.

Id. (citing White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 145 (1980)).[13]

---

States.

From these principles, the Court concluded that "the laws of Georgia can have no force" on Cherokee land. Id. at 561 (quoted in Oneida Indian Nation of New York State v. County of Oneida, N.Y., 414 U.S. 661, 671 (1974)).

[13]Dorsey argues that the Mescalero test should be used to decide whether there is complete preemption here, but the Supreme Court has not yet applied that test to a case in which complete preemption is asserted. Since IGRA meets the more demanding standard from Metropolitan Life, we need not consider whether the Mescalero test is appropriate here. Mescalero, 462 U.S. at 333-34.

This line of cases demonstrates a continuing federal concern for tribal economic development, self-sufficiency, and self-government which Congress reaffirmed in the text of IGRA. 25 U.S.C. § 2701(4). In this overall historical context, the intent of Congress that IGRA "expressly preempt the field" is particularly compelling, and the statute can be seen to have the "extraordinary" preemptive force required by <u>Metropolitan Life</u>.

C.

All the claims in this case relate to Dorsey's representation of the nation during consideration by the Winnebago Gaming Commission of the management companies' permanent license applications, and all the claims must be examined individually in order to determine whether they fall into the scope of complete preemption.

The parties suggest quite different tests to determine which claims may be preempted. Dorsey suggests that any claim which "directly implicates Indian gaming regulation" is preempted. Its position is that all of the claims are within the scope of preemption because their resolution would require an examination of the fairness of the nation's licensing process. The management companies argue that only claims requiring "application or interpretation of IGRA" should be preempted.

Relevant to analysis of the scope of preemption are both the rationale used in <u>Metropolitan Life</u> concerning ERISA preemption and congressional statements about IGRA itself. Whether a cause of action has a sufficient relationship to an employee benefit plan determines the scope of ERISA's preemption. <u>Metropolitan Life</u>, 481

U.S. at 62-63, 67. Thus, state law regulating insurance is viable or "saved," but all other state law claims "relating to" an employee benefit plan and covered under § 502(a) of ERISA are preempted. Id. The statement by Congress that IGRA is intended to "expressly preempt the field in the governance of gaming activities on Indian lands" is a useful starting point in determining congressional intent. See Pilot Life Insurance Co. v. Dedeaux, 481 U.S. 41, 45 (1987) (citations omitted). The key question is whether a particular claim will interfere with tribal governance of gaming.

The tribal licensing process is required and regulated by IGRA. Tribes must submit the results of the required background checks to the NIGC. 25 U.S.C. §§ 2710(d)(1)(A)(ii), 2710(b)(2)(F)(ii). A description of that licensing process must be included in the tribal ordinance or resolution necessary to begin class II and class III gaming. That ordinance or resolution must in turn be approved by the NIGC. 25 U.S.C. § 2710(b), (d). The question of licensing is therefore of "central concern to the federal statute," Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1, 25-26 (1983), and Congress unmistakably intended that tribes play a significant role in the regulation of gaming.

Congress struggled through several sessions to find a statutory scheme which would incorporate and balance the interests of tribes, states, and the federal government. The tribal-state compact was the device it ultimately chose. If a state, through its civil laws, were able to regulate the tribal licensing process outside the parameters of its compact with the nation, it would bypass the balance struck by Congress.[14] Any claim which would

_____

[14]The management companies do not argue that Wisconsin's compact with the nation was intended to transfer any relevant control of the tribal licensing process. The compact sets out licensing criteria for the nation, but they largely mirror the federal standards in IGRA. The compact also requires the tribe to provide the results of its background checks to the state. The state may make its own determination regarding the suitability of a license applicant. Compact, § VII. Under both IGRA and the compact, the tribe has the right to deny a license even where the state would approve it.

-22-

directly affect or interfere with a tribe's ability to conduct its own licensing process should fall within the scope of complete preemption.[15]

The management companies argue that their claims do not affect the nation's ability to regulate gaming because this action only involves non-Indian parties, but this overlooks the nation's relationship with Dorsey. The nation hired Dorsey to assist it in carrying out its congressionally authorized governmental responsibility to determine the suitability of the management companies.

Dorsey argues that the management company causes of action are direct challenges to the outcome of the licensing process and therefore directly implicate governance of gaming. At one point the second amended complaint even refers to a "sham licensing process," and it contains numerous references to a "scheme" by Dorsey and the "members and elements" of the nation to use the licensing process to terminate the nation's relationship with the management companies.

Subject to congressional divestment, the nation has a great interest in not having its decisions questioned by the tribunal of another sovereign. IGRA reflects the intent of Congress that tribes maintain considerable control of gaming to further their economic and political development. The nation established the

_____

[15]Emphasis on the effect a claim would have on the tribe's ability to govern gaming is also consistent with the Mescalero test of whether a claim "interferes or is incompatible with federal and tribal interests reflected in federal law." 462 U.S. at 334.

-23-

gaming commission as its licensing body under IGRA and prescribed the procedures to be used by the commission under the nation's gaming ordinance. The nation also has an appeals process which the management companies used in this action against the tribe.[16] Nothing in the structure created by IGRA or in the tribal-state compact here suggests that the management companies should have the right to use state law to challenge the outcome of an internal governmental decision by the nation.

The management companies chose to enter into the licensing process in the hope of securing a contract with the tribe. The tribe has a recognized interest in connection with parties who have explicit consensual dealings with it. Cf. Montana v. United States, 450 U.S. 544, 565-66 (1981); A-1 Contractors v. Strate, 76 F.3d 930, 935 (8th Cir. 1996) (en banc).

Tribes need to be able to hire agents, including counsel, to assist in the process of regulating gaming. As any government with aspects of sovereignty, a tribe must be able to expect loyalty and candor from its agents. If the tribe's relationship with its attorney, or attorney advice to it, could be explored in litigation in an unrestricted fashion, its ability to receive the candid advice essential to a thorough licensing process would be compromised. The purpose of Congress in requiring background checks could be thwarted if retained counsel were inhibited in discussing with the tribe what is learned during licensing investigations, for example. Some causes of action could have a direct effect on the tribe's efforts to conduct its licensing process even where the tribe is not a party.

Those causes of action which would interfere with the nation's ability to govern gaming should fall within the scope of IGRA's

---

[16]The management companies dismissed their appeal after they reached a settlement with the nation.

preemption of state law. In their briefs the parties concentrated their thinking on overall issues of preemption and did not explore the possibility that only some claims might fall within the preemptive scope of IGRA. In light of this, it would be unwise for us now to rule definitively on the individual claims, but some factors are likely to be of relevance to the development of the issues on remand.

The proposition that the preemptive scope of IGRA encompasses a claim is strong for claims that would intrude on the tribe's regulation of gaming or would require examination of the relationship between Dorsey and the nation. Inquiry into Dorsey's performance of its duty to the nation could threaten the tribe's legitimate interests, question the correctness of its licensing decisions, and risk influencing how counsel could serve tribes in the future. Under IGRA state law may not be applied to regulate the tribal licensing process, even if indirectly, unless a tribal-state compact so provides.

Potentially valid claims under state law are those which would not interfere with the nation's governance of gaming. To the extent a count alleges a violation of a duty owed to one of the management companies because of an attorney-client relationship or other independent duty, it may be a valid state law count. Resolution of such claims would not appear to involve attempted discovery of communications by the tribe to Dorsey or the merits of the licensing decision.

Any claims based on Dorsey's duty to the nation during the licensing process would appear to fall within the scope of IGRA's complete preemption. Such preempted claims may not be remanded to state court under 28 U.S.C. § 1367(c) even though they purport to raise only issues of state law. In re City of Mobile, 75 F.3d 605, 607 (11th Cir. 1996); Borough of West Mifflin v. Lancaster, 45 F.3d 780, 787 (3rd Cir. 1995); Burks v. Amerada Hess Corp., 8 F.3d 301,

304 (5th Cir. 1993).

                                    IV.


     Dorsey's final argument is that the district court abused its
discretion by remanding count IX.  Originally count IX alleged a violation
of the Indian Civil Rights Act.  25 U.S.C. § 1302.  After the case was
removed, the management companies amended count IX to allege a conspiracy
to violate the Indian Civil Rights Act.  Dorsey argues that the amended
count arises under federal law and could not be remanded.


     The district court correctly noted that there is no private right of
action under the Indian Civil Rights Act under these circumstances.  Santa
Clara Pueblo v. Martinez, 436 U.S. 49 (1978).  It then concluded that the
management companies had stated a cause of action for conspiracy under
Minnesota law and cited Merrell Dow Pharmaceuticals Inc. v. Thompson, 478
U.S. 804 (1986).  In Merrell Dow, the Supreme Court concluded that a state
law cause of action merely incorporating federal law as an element does not
arise under federal law.  The negligence claim in Merrell Dow arose under
state law even though it was alleged that a violation of the Food, Drug,
and Cosmetic Act, 21 U.S.C. § 301 et seq., created a rebuttable presumption
of negligence.  Id.


     Merrell Dow does not control here, however, because unlike the
negligence action in that case, a conspiracy claim is not an independent
cause of action.  Under Minnesota law conspiracy is based on the commission
of an underlying tort:

     [S]ince in so-called civil conspiracy cases liability is
     predicated upon the tort committed by the conspirators and not
     upon the conspiracy, allegation[s] of conspiracy do not change
     the nature of the cause of action.

Harding v. Ohio Casualty Insurance Co., 41 N.W.2d 818, 825 (Minn. 1950).
Thus, "the gist of the action is not the conspiracy

                                   -26-

charged, but the tort working the damage to the plaintiff." <u>Id.</u> at 824 (citations omitted). The Minnesota court concluded that "[a]ccurately speaking, there is no such thing as a civil action for conspiracy," and "there can be no recovery unless substantive wrongs are pleaded." <u>Id.</u> The true purpose of conspiracy is "to show facts for vicarious liability of defendants for acts committed by others, joinder of joint tortfeasors, and aggravation of damages." <u>Id.</u>

The conspiracy claim here arises under federal law for the purposes of jurisdiction since federal law is the only measure of whether Dorsey and the nation conspired to commit an unlawful act or to commit a lawful act in an unlawful manner. <u>See</u> <u>Harding</u>, 41 N.W.2d at 824. The Indian Civil Rights Act, 25 U.S.C. § 1302, is the sole basis for the conspiracy alleged in amended count IX, so provisions of that law are the substantive measures to be employed. In contrast, the federal standard used in <u>Merrell Dow</u> was merely one criterion the jury could use to decide whether the defendant's acts were unreasonable as a matter of state law. Furthermore, if state law conspiracy (or aiding and abetting) claims based solely on violations of federal law were said to arise under state law, litigants could both avoid federal question jurisdiction and create causes of action where Congress intended there to be none. Count IX was properly removed; it stated a federal question, and it could therefore not be remanded under 28 U.S.C. § 1367(c)(3). <u>In re City of Mobile</u>, 75 F.3d 605, 607 (11th Cir. 1996); <u>Borough of West Mifflin v. Lancaster</u>, 45 F.3d 780, 787 (3rd Cir. 1995); <u>Burks v. Amerada Hess Corp.</u>, 8 F.3d 301, 304 (5th Cir. 1993).

V.


Because federal questions remained, it was error to send this case back to state court.  The order of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.  The petition for a writ of mandamus is dismissed.


A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.