# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2822

_____

| | | |
|---|---|---|
| Casino Resource Corporation, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Harrah's Entertainment, Inc. d/b/a | * | District of Minnesota. |
| Harrah's Southwest Michigan Casino | * | |
| Corporation, Inc.;Harrah's Southwest | * | |
| Michigan Casino Corporation; | * | |
| John Does, 1-10, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: October 19, 2000

Filed: March 13, 2001

_____

Before WOLLMAN, Chief Judge, BEAM and MORRIS SHEPPARD ARNOLD,
Circuit Judges.

_____

BEAM, Circuit Judge.

After Harrah's Entertainment, Inc. (Harrah's) entered into a termination agreement that ended its gaming development and management opportunities with the Potawatomi Indian Nation (Nation or Tribe), Casino Resource Corporation (CRC) sued

Harrah's for breach of contractual and fiduciary duties and for tortious interference with CRC's "contractual and prospective economic advantage." The district court found that CRC's state law claims are preempted by federal law, which provides no independent cause of action, and, therefore, dismissed CRC's suit. CRC appeals. We reverse and remand.

## I.    BACKGROUND

In 1994, CRC obtained a right of first refusal to negotiate a gaming management contract with the Nation. CRC subsequently entered into a memorandum of understanding with Harrah's, in which the parties agreed to jointly pursue gaming opportunities with the Nation. Harrah's established a subsidiary (hereinafter also referred to as "Harrah's") to explore the endeavor. Eventually, the subsidiary negotiated various development and management contracts with the Nation, after which Harrah's and CRC entered into a "Technical Assistance and Consulting Agreement" (Consulting Agreement) "to formalize [CRC's] relationship with Harrah's regarding CRC's ongoing role in the development of the proposed Enterprise."[1]

---

[1]The Consulting Agreement states:

3.1    CRC has provided and will continue, during the term of the Casino Agreements . . ., to provide . . . technical services related to the development of the proposed Enterprise in the form of advice and consultation . . . .

3.1.1  CRC agrees that it shall provide such services directly to Harrah's and shall have no right to affect the management decisions made by Harrah's in its negotiations for, or the performance of, the Casino Agreements. Further, CRC shall not interfere in any way or involve itself directly nor will it encourage or in any way involve others to interfere or involve themselves with the operation of the Enterprise unless requested by Harrah's. . . .

On September 12, 1998, Harrah's and the Nation executed a termination agreement that dissolved any prior development or management agreement between them. Among recited impediments to their relationship were the Michigan Legislature's refusal to negotiate a tribal-state gaming compact, as required by the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701 et seq., and an unresolved dispute as to whether the purchase of a riverboat casino (which operated within a non-compete radius restriction) by a Harrah's affiliate amounted to a material breach of all agreements between Harrah's and the Nation. The Bureau of Indian Affairs approved the termination agreement in October of 1998.

On September 14, 1998, CRC filed suit in federal court, asserting diversity jurisdiction and alleging that "[a]lthough the [Consulting Agreement] stated that it was not intended to create a partnership or joint venture between the parties, the parties['] relationship under the Agreement was, in fact, a partnership or joint venture." CRC further alleged that Harrah's "breached the [Consulting Agreement] and the fiduciary duty it owed to CRC and tortiously interfered with CRC['s] contractual and prospective economic advantage by . . . purchasing an interest in a competing casino which caused the Tribe to refuse to do further business with the Harrah's/CRC partnership or joint venture," and by withholding information from CRC.

Harrah's moved to dismiss CRC's complaint pursuant to Federal Rules of Civil Procedure 12 and 56. The district court concluded that, because adjudication would require the court to intrude into the Nation's governance of its own gaming affairs, CRC's state law claims are preempted by IGRA. The court, therefore, dismissed CRC's suit because IGRA provides no independent cause of action.

## II. DISCUSSION

We review a district court's grant of a Rule 12(b)(6) motion to dismiss de novo, construing the complaint most favorably to the non-moving party, and will dismiss only if it is clear that no relief can be granted under any set of facts that could be proven consistent with the allegations. Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995). Similarly, we review the grant of a motion for summary judgment de novo, affirming if the evidence, viewed in the light most favorable to the nonmoving party, shows that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Hughes v. Ortho Pharm. Corp., 177 F.3d 701, 704 (8th Cir. 1999)

"State jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 334 (1983). Congress, by enacting IGRA, has established the preemptive balance between tribal, federal, and state interests in the governance of gaming operations on Indian lands. Gaming Corp. of America v. Dorsey & Whitney, 88 F.3d 536, 548-49 (8th Cir. 1996); 25 U.S.C. § 2710(d)(3)(C); 1988 U.S.C.C.A.N. 3076 (IGRA "expressly preempt[s] the field in the governance of gaming activities on Indian lands"). Therefore, we have said that "[a]ny claim which would directly affect or interfere with a tribe's ability to conduct its own [gaming] licensing process should fall within the scope of [IGRA's] complete preemption." Gaming Corp., 88 F.3d at 549.

In Gaming Corp., management companies pursued claims against a law firm that had represented a Native American tribe during development of a casino. Id. at 539-40. The companies argued that their claims did not affect the tribe because only non-Indian parties were involved. Id. at 549. Rejecting that argument, we reasoned that the tribe's relationship with the firm was not to be overlooked in that the firm was

retained to carry out the tribe's congressionally-authorized governmental responsibility. Id. We concluded that those causes of action that would interfere with the tribe's ability to govern gaming fall within IGRA's complete preemption of state law.[2]   Id. at 550.

Gaming Corp. dealt with the regulation of tribal gaming. Id. at 549. In contrast, the instant case presents the issue of whether IGRA preempts state law claims by one non-tribal entity against another, when resolution requires some review of a contract terminating a gaming management arrangement between one of the parties and a tribal entity.  Unlike Gaming Corp., where we stifled management companies' attempts to employ state law to circuitously challenge the outcome of an Indian nation's internal governmental decisions, here the challenge is merely to the decisions of a management company. Therefore, Gaming Corp. does not predestine our resolution.

"Congressional intent is the touchstone of the complete preemption analysis." Magee v. Exxon Corp. 135 F.3d 599, 601-02 (8th Cir. 1998).  Through IGRA, Congress has sought to bring sundry policy goals to fruition, including  protecting tribes' sovereign immunity, protecting tribes' "considerable control of gaming to further their economic and political development," Gaming Corp., 88 F.3d at 549, protecting

_____

[2]Still, even when complete preemption applies, there may be claims that do not fall within its scope.  Gaming Corp., 88 F.3d at 543.  Consequently, all claims must be individually scrutinized.  Id. at 548. In contrast to preempted claims:

> Potentially valid claims under state law are those which would not interfere with the nation's governance of gaming.  To the extent a count alleges a violation of a duty owed to one of the management companies because of an attorney-client relationship or other independent duty, it may be a valid state law count.  Resolution of such claims would not appear to involve attempted discovery of communications by the tribe to [the firm] or the merits of the licensing decision.

Id. at 550.

"the Indian gaming industry from corruption and . . . provid[ing] for extensive federal oversight of all but the most rudimentary forms of Indian gaming," Tamiami Partners v. Miccosukee Tribe of Indians, 63 F.3d 1030, 1033 (11th Cir. 1995).  CRC's claims encroach on no IGRA goal.

CRC's claims also fall outside IGRA's protective structure.  But cf. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 64 (1978) (finding that, where Congress has sought to achieve competing purposes, courts must be "more than usually hesitant to infer from its silence a cause of action" that will serve one of the legislative purposes but undermine the other); Florida v. Seminole Tribe of Florida, 181 F.3d 1237, 1248 (11th Cir. 1999) ("'when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies'") (citation omitted).  Although IGRA addresses management and services contracts to some degree,[3] it was not designed to deal with disputes like this,[4] which, despite CRC's

---

[3]IGRA recognizes a tribe's authority to enter into contracts for the management and operation of an Indian gaming facility by an entity other than the tribe or its employees, so long as certain requirements are satisfied and subject to approval by the Chairman of the National Indian Gaming Commission (Commission).  25 U.S.C. §§ 2710(d)(9), 2711.  Agreements collateral to such management contracts are likewise constrained.  25 U.S.C. § 2711(a)(3).  In contrast, contracts for supplies, services, or concessions involving amounts in excess of $25,000 annually are merely subject to audits by the Commission.  25 U.S.C. §  2710(b)(2)(D); 1988 U.S.C.C.A.N. 3085 ("[t]he term 'management contract' does not include contracts or agreements for the procurement of particular services, materials or supplies," which are subject to Commission oversight under another provision).

The Senate felt that "the plenary power of Congress over Indian affairs, and the extensive government regulation of gambling, provide[ it with] authority to insist that certain minimum standards be met by non-Indians when dealing with Indians."  1988 U.S.C.C.A.N. 3085.  One such minimum requirement for approval is that the management contract must contain grounds and mechanisms for its termination; however, termination does not require the Commission's approval.  25 U.S.C. §

creative characterization, is essentially a dispute between a non-tribal general contractor and non-tribal sub-contractor.[5]  In <u>Bruce H. Lien Co. v. Three Affiliated Tribes</u>, 93 F.3d 1412 (8th Cir. 1996), we distinguished the approval and review process from the determination of the legal validity of a management contract, thereby finding the latter outside the scope of the administrative bodies bearing IGRA responsibilities. <u>Id.</u> at 1417-18.  We recognized, however, that:

> While the issue of [a management] contract's validity does not raise a federal question per se, certainly there are aspects of . . . [tribal gaming] dispute[s] which do.  Particularly where the entire association between the parties (and their various disputes) arise under IGRA, and where the management agreement at issue, once approved, remains so until disapproved by the [Commission].

<u>Id.</u> at 1421.  Here, the association between CRC and Harrah's does not arise under IGRA nor is an approved management contract at issue.

---

2711(b)(6).  The management contract must also indicate "whether and to what extent contract assignments and subcontracting are permissible" and "whether and to what extent changes in the ownership interest in the management contract require advance approval by the tribe."  25 C.F.R. § 531.1(l), (m) (2000).  Compacts negotiated between the tribe and state determine whose criminal and civil laws and regulations ("that are directly related to, and necessary for, the licensing and regulation" of tribal gaming) will apply and what remedies are available for contract breaches.  25 U.S.C. § 2710(d)(3)(C).

[4]CRC confounded us with its suggestion that "[b]ecause Congress specifically required a mechanism to resolve . . . disputes [like this one], it could not have intended that such disputes be preempted."  That argument would mandate a conclusion contrary to the one it pursues on appeal.  <u>Ante</u> at 6 (quoting <u>Seminole Tribe</u>, 181 F.3d at 1248).

[5]A contract dispute with the Nation itself would present another situation altogether.  <u>See</u> <u>Tamiami Partners</u>, 63 F.3d at 1048-49 (finding that district court properly dismissed breach of contract claim that sought money damages from and injunctive relief against a tribe when such relief was not contemplated by the management contract).

Not every contract that is merely peripherally associated with tribal gaming is subject to IGRA's constraints. E.g., International Gaming Network v. Casino Magic Corp., 120 F.3d 135 (8th Cir. 1997); Calumet Gaming Group-Kansas, Inc. v. Kickapoo Tribe of Kan., 987 F. Supp. 1321 (D. Kan. 1997); Gallegos v. San Juan Pueblo Bus. Dev. Bd., Inc. 955 F. Supp. 1348, 1350 (D.N.M. 1997) (finding no federal subject matter jurisdiction where, although unclear whether an agreement was a management contract or lease of slot machines, because the contract was not approved by the Commission Chairman, at most there was only an attempt at forming a management contract). For instance, in Calumet Gaming, the court found that a dispute arising from a consulting agreement was not subject to IGRA and, consequently, there was no need to interpret or apply IGRA to resolve the plaintiff's state law claims for breach of that agreement. 987 F. Supp. at 1325.

Since Gaming Corp., we have addressed, on the merits, a state common law claim with strikingly similar facts to those of the present matter. Casino Magic is notable here only for its conspicuously absent discussion of IGRA's preemptive force. 120 F.3d at 135. There, jurisdiction was based on diversity, the case was governed by South Dakota law, and the claim was for a non-tribal entity's purported tortious interference with a business relationship between a tribe and another non-tribal entity. Id. It is apparent that the claim was not preempted by IGRA; otherwise, the matter could not have been resolved based on state law.[6] Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 64-65 (1987) (reasoning that, where Congress had given explicit direction, allowing a party to obtain remedy under state law would undermine that federal scheme).

---

[6]The tribe had terminated a management agreement that was not binding on the parties because IGRA required it to be approved by the Commission. Casino Magic, 120 F.3d at 135. After reviewing the tribe's reasons for termination and the timing of its actions, we concluded that the record could not support a reasonable inference that, but for the non-tribal defendant's brief encounter with tribal members, the non-tribal plaintiff 's advantageous relation with the tribe would have continued. Id. at 137.

Resolution of the present matter requires no more intrusion into the Nation's ability to enter into and terminate management contracts than was necessary in Casino Magic. Unlike the potential infringement on a tribe's governance of gaming that was present in Gaming Corp., a non-tribal entity's state law claim (that does not implicate tribal interests) against another non-tribal entity is not of central concern to IGRA.[7] See Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 25-26 (1983) (determining that state claim did not arise under federal statute and was, therefore, not preempted by that statute). In Gaming Corp., the fiduciary relationship between the tribe and law firm underpinned our conclusion. 88 F.3d at 549. Here, the Nation and Harrah's were only associated by an arm's length contract, which was ultimately terminated. Therefore, CRC's claims do not present the same potential for interference with IGRA-apportioned responsibilities as that presented in Gaming Corp.

Although the district court expressed concern that resolution of CRC's claims will intrude into the Nation's decision-making process regarding termination of management contracts, we do not see the same cause for alarm. CRC's claims can likely be resolved by looking to the four corners of the pertinent documents.[8] Any concern is further ameliorated because, absent a tribal-state compact, the Nation has not waived its sovereign immunity from state intervention, Seminole Tribe, 181 F.3d

---

[7]We do see potential situations, however, where a tribe's interests could be jeopardized by disputes between non-tribal entities, such as where a valid management contract calls for a tribe to indemnify a non-tribal management company or the management company is acting as an agent of the tribe. Neither scenario is present in this case.

[8]Of particular interest is the Consulting Agreement, which clearly suggests that the relationship between CRC and Harrah's is that of general and sub-contractors, and not a partnership. The agreement also contains a specific damages provision, which Harrah's points to in partial support of its argument that damages are too speculative to permit relief. However, we do not reach the merits of CRC's claims or Harrah's proposed alternative bases for affirming dismissal.

at 1242, because the Nation is insulated from agreements that fall outside IGRA's protective scheme, <u>Turn Key Gaming, Inc. v. Oglala Sioux Tribe</u>, 164 F.3d 1092, 1094-95 (8th Cir. 1999), and because the Nation (a non-party) can be protected in the discovery process, <u>e.g.</u>, Fed. R. Civ. P. 45.

## III.   CONCLUSION

It is a stretch to say that Congress intended to preempt state law when there is no valid management contract for a federal court to interpret, when the Nation's broad discretion to terminate management contracts is not impeded, and when there is no threat to the Nation's sovereign immunity or interests. Dismissal based on preemption was error. Because the record is not developed outside that vein, we remand to the district court for further action not inconsistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.