OPINION OF THE COURT
Joseph G. Makowski, J.
Background Summary
On June 20, 2001, New York State Governor George E. Pataki and the Seneca Nation of Indians entered into a memorandum of understanding (MOU) which established certain terms for a Tribal-State Compact to authorize the development of three class III gaming casinos by the Seneca Nation on Indian lands in the State of New York. In August 2001, the New York State Legislature enacted legislation enabling the establishment and operation of the casinos by the Seneca Nation (see L 2001, ch 383, part B, § 2, enacting Executive Law § 12). The enabling legislation provides authorization for the Governor to execute a Tribal-State Compact pursuant to the Indian Gaming Regulatory Act of 1988 (25 USC §§ 2701-2721; 18 USC §§ 1166-1168) (hereafter *651 IGRA) with the Seneca Nation that is “consistent with” the June 20, 2001 MOU (see Executive Law § 12 [a]). Thereafter, on August 18, 2002, the Governor and. the Seneca Nation entered into the Nation-State Gaming Compact (the Compact) (see Powers affidavit, sworn to on May 13, 2004, exhibit 11) authorized by the New York State Legislature in Executive Law § 12.
All parties have moved for summary judgment. Plaintiffs maintain that the operative provisions of the MOU mandate location of a class III gaming casino in the City of Buffalo. Plaintiffs argue that in enacting Executive Law § 12 the New York State Legislature, pursuant to its policy-making authority under New York Constitution, article III, § 1, empowered the Governor to execute a Tribal-State Compact with the Seneca Nation consistent with the MOU. Plaintiffs further contend that to the extent that paragraph 11 (a) (2) of the Compact authorizes the Seneca Nation to locate a casino anywhere in Erie County, outside of the City of Buffalo, the Compact violates the principle of separation of powers under the New York State Constitution (see NY Const, art III, § 1; art IV § 1) and, to that extent, is null and void and should be severed from the Compact.
Plaintiffs seek a declaration that the Compact is unconstitutional in part and void under article III, § 1 of the New York Constitution to the extent that it authorizes a Seneca Nation casino anywhere in Erie County outside of the City of Buffalo. In addition, plaintiffs seek a permanent injunction barring defendants and their agents and assigns from transferring property owned by Uniland in the Town of Cheektowaga to the Seneca Nation and/or its affiliates, and from carrying out or otherwise undertaking any actions to authorize or assist in the placement of a Seneca Nation casino anywhere in Erie County outside the City of Buffalo, including but not limited to, any expenditure of state funds or any acts to transfer property or to assist any proposal made, or to be made to, the United States Secretary of the Interior concerning the casino (see Powers affidavit, sworn on to May 13, 2004, exhibit 1, complaint [hereafter complaint], at 16).
The Governor and the State (collectively, the State) contend that plaintiffs lack standing to sue, that the action is premature, and that the Seneca Nation is an indispensable party in whose absence the suit cannot continue. On the merits, the State and the Town contend that the Compact is consistent with the MOU, that a provision in the Compact can be construed to permit the *652 Seneca Nation the authority to choose to operate a casino, with the Governor’s agreement, on property purchased by them anywhere in Erie County, and that the delegation of such discretion was ratified by the Legislature upon the Governor’s certification to it on August 18, 2002. With respect to the relief sought by plaintiffs, the State and the Town contend that such relief requires reformation of the Compact, which remedy they contend is barred by the Compact’s severability clause, by the absence of the Seneca Nation as a party, and by the doctrine of federal preemption.
For the reasons recited in this memorandum decision and order, the court grants plaintiffs’ motion for summary judgment, and declares that a portion of paragraph 11 (a) (2) of the Compact, which permits the Seneca Nation to locate a class III gaming facility in any location in Erie County outside of the City of Buffalo, is unconstitutional under article III, § 1 and article IX § 1 of the New York Constitution as violative of the principle of separation of powers. Specifically, the court declares that portion of paragraph 11 (a) (2) which recites “or at such other site as may be determined by the Nation in the event a site in the City of Buffalo is rejected by the Nation for any reason” is unconstitutional under article III, § 1 of the New York Constitution. The court further declares that provision of paragraph 11 (a) (2) of the Compact to be null and void and severs it from the Compact.
The court grants plaintiffs’ application for a permanent injunction against defendants as more fully described in the relief provisions herein. Finally, the court denies the cross motions of the defendants seeking dismissal of the complaint.
Factual Background
Congress passed the Indian Gaming Regulatory Act in 1988 in order to provide “a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments” (25 USC § 2702 [1]). Obviously, not all lands owned by a recognized Indian tribe or Nation are “Indian lands”; IGRA defines Indian lands as reservation lands and “any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against *653 alienation and over which an Indian tribe exercises governmental power” (25 USC § 2703 [4] [B]). Because New York State was never solely federal territory, the United States normally does not hold Indian lands in the state in trust for a tribe; rather, such land may be held in restricted fee.[1]
One consequence of compliance with IGRA is that “Indian gaming conducted in accordance with [IGRA’s] requirements is exempt from federal and state criminal gambling prohibitions” (Pueblo of Santa Ana v Kelly, 104 F3d 1546, 1549 [1997], cert denied 522 US 807 [1997]). There are three classes of gaming under IGRA: class III gaming is defined as all forms of gaming that are not included in the other two classes (see 25 USC § 2703 [8]), and includes banking card games such as baccarat, chemin de fer, blackjack and electronic or electromechanical facsimiles of any game of chance and slot machines of any kind (cf. 25 USC § 2703 [7] [B]).
Under IGRA, the conduct of class III gaming on Indian lands is lawful only if
“(A) authorized by an ordinance or resolution [duly adopted by the Tribe or Nation and approved by the Chairman of the National Indian Gaming Commission];
“(B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and
“(C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph [2710 (d) (3)] that is in effect” (25 USC § 2710 [d] [1] [ARC]).[2]
Should a state not negotiate in good faith with a tribe that seeks to enter into such a compact, IGRA authorizes a suit in *654 federal court by the tribe (see 25 USC § 2710 [d] [7]; but see Seminole Tribe of Fla. v Florida, 517 US 44, 47 [1996] [Congress lacked authority under Indian Commerce Clause and IGRA to abrogate states’ sovereign immunity]).
Under IGRA, a compact may include provisions relating to (i) application of directly related criminal and civil laws and regulations of the tribe and the state; (ii) allocation of jurisdiction between the state and the tribe to enforce such laws; (iii) state assessments to defray the costs of regulating gaming; (iv) taxation by the tribe; (v) remedies for breach of contract; (vi) standards of operation and maintenance of gaming facilities; and (vii) “any other subjects that are directly related to the operation of gaming activities” (25 USC § 2710 [d] [3] [C] [vii]).
A duly authorized compact does not go into effect until the United States Secretary of the Interior approves or fails to disapprove it (see 25 USC § 2710 [d] [3] [B]; [8]). The Secretary may disapprove a compact only if it violates the IGRA, other provisions of federal law, or the trust obligations of the United States to the Indians (see 25 USC § 2710 [d] [8] [B]). Upon such approval or failure to disapprove, the compact goes into effect when it is published in the Federal Register (§ 2710 [d] [1] [C]; [3] [B]; [8] CD]).
On June 20, 2001, the Governor and the Seneca Nation entered into an MOU concerning the negotiation of a Tribal-State Compact (see Powers affidavit, sworn to on May 13, 2004, exhibit 6 [hereafter MOU]).[3] Under a paragraph headed “Location of Facilities,” the MOU states:
“Location of Facilities. The Parties agree that any facilities shall be located on ‘Indian Lands’ as that term is used and defined in the IGRA section 2703 (4). The Parties agree that the Compact shall authorize the establishment of a Class III gaming facility at locations in Niagara County in the City of Niagara Falls and in Erie County in the City of Buffalo...
“With respect to the facility in the City of Niagara Falls, the Nation agrees that it will be located on the parcel of land designated in the attached map of downtown Niagara Falls [footnote 2]. With respect to the facility in the City of Buffalo, the Nation has not *655 yet decided upon an appropriate parcel of land suitable for development of the facility [footnote 3].”
(MOU at 1-2 [emphasis supplied].)[4]
Footnote 2 of the MOU provides that “[i]n the event the specified Niagara Falls site is not available for any reason, the Nation would propose an alternate site.” Footnote 3 of the MOU provides: “In the event a site in the City of Buffalo site [sic] is not available for any reason, the Nation would propose an alternate site” (MOU at 2 n 3 [emphasis supplied].)
Under a paragraph headed “Ratification,” placed immediately above the signature line, the MOU states:
“Because of the uncertainties caused by the case Saratoga Chamber of Commerce v Pataki, and further because both Parties desire an expedited time line for development with as much certainty as possible, it is mutually agreed that the Parties will jointly seek timely (1) legislative authorization for the Governor to execute a Tribal-State Compact with the Seneca Nation consistent with this Memorandum of Understanding-, and, (2) ratification of the Compact by the enrolled members of the Nation and the United States Department of the Interior”
(MOU at 6 [emphasis supplied]).[5]
The MOU also dealt with the issue of funding to purchase land for and develop the facilities. The MOU recites that the State agrees to support the Nation in acquiring restricted fee status for the parcels “described, supra, in the City of Buffalo and the City of Niagara Falls” and “to assist the Nation in acquiring such parcels within the limits of the Seneca Settlement Act funds that the Nation has committed to the acquisition” (MOU at 2). Further, the MOU provides that “[t]he Nation agrees that it will use all but $5 million of the funds remaining from that appropriated by the Seneca Settlement Act to acquire the parcels in the City of Niagara Falls and the City of Buffalo.” (MOU at 3 [emphasis supplied].)
Under the Seneca Nation (New York) Land Claims Settlement Act (Settlement Act) (25 USC §§ 1774-1774f), the State *656 expended $16,000,000 in cash (plus $9,000,000 “for economic or community development”) to settle claims concerning leases of Seneca Nation land in Salamanca in Cattaraugus County, New York (see 25 USC §§ 1774, 1774d [c]). If the Seneca Nation uses these funds, and an additional $30,000,000 contributed by the federal government, to purchase land “within its aboriginal area in the State or situated within or near proximity to former reservation land,” such lands shall, absent a certain determination by the United States Secretary of the Interior (the Secretary), be held in restricted fee status by the Seneca Nation (see 25 USC § 1774f [c]). The Seneca Nation may build a class III gaming facility on the land so purchased and held, however, only if the Secretary determines that the lands so acquired are “in settlement of a land claim” (see state memorandum [hereinafter State mem] at 16 n 11; see generally 25 USC § 2719 [b] [1] [B] [i]; see also Powers affidavit, sworn to on May 13, 2004, exhibit 13, at 6-7 [Letter of Secretary of Department of Interior (DOI) to Governor Pataki]).
The State and “host municipalities” both receive payments under the terms of the MOU The State is promised a revenue share over the 14-year period of the agreement, and “host municipalities” will be compensated out of the State’s share of the revenues, in exchange for the State granting the Seneca Nation an exclusive franchise for certain gaming over more than 10,000 square miles in the western New York area (see MOU at 3; see also Powers reply affidavit, exhibit D [Seneca Gaming Corp. bond offering mem, dated Apr. 21, 2004]). Expenditures by the State associated with the regulation of the gaming facilities will be reimbursed by the Seneca Nation (see MOU at 6, citing 25 USC § 2710 [d] [3] [C] [iii]).
After the MOU was executed, the Governor provided a copy of it to the members of the Legislature and requested legislative authorization to enter into a Tribal-State Compact with the Seneca Nation (see affidavit of Senator Byron W Brown, sworn to on May 13, 2004, 1Í 7 [New York State Senator for the 60th District]). The Legislature took such action by enacting chapter 383, part B, amending the Executive Law by adding a new section 12 (L 2001, ch 383, part B, § 2, eff Oct. 29, 2001). That section provides in pertinent part:
“Notwithstanding any other law, the state, through the governor, may execute a tribal-state compact with the Seneca Nation of Indians pursuant to the [IGRA] consistent with a memorandum of under *657 standing between the governor and the president of the Seneca Nation of Indians executed on June twentieth, two thousand one . . . Such tribal-state compact shall be deemed ratified by the legislature upon the governor’s certification to the temporary president of the senate, the speaker of the assembly, and the secretary of state, that such compact, through its terms, by a memorandum of understanding or other agreement between the state and Nation, by a Nation’s ordinance or resolution, by statute, by executive order, or by the terms of any other agreement entered into by or on behalf of the Nation, provides [certain assurances concerning labor unions, a civil recovery system and liability insurance coverage]” (Executive Law § 12 [a] [emphasis supplied]).[6]
Thereafter, on August 18, 2002, the Governor and the Nation executed the Nation-State Gaming Compact (see Powers affidavit, sworn to on May 13, 2004, 1Í 54, and exhibit 11 [hereafter Compact]). Also on August 18, 2002, the Governor provided to the Temporary President of the Senate, to the Speaker of the Assembly, and to the Secretary of State, the certification recited in Executive Law § 12 (a) (see Sullivan affirmation, dated May 27, 2004, exhibit A).
Paragraph 1 (r) of the Compact executed by the Governor and the Seneca Nation expressly incorporates the MOU into the Compact (see Compact 111 [r]). Paragraph 11 involves “Sites for Gaming Facilities.” That paragraph provides:
“(a) Subject to the provisions of this paragraph 11, the Nation may establish Gaming Facilities:
“(1) in Niagara County, at the location in the City of Niagara Falls indicated on the map of downtown Niagara Falls attached as Appendix I . . . and “(2) in Erie County, at a location in the City of Buffalo to be determined by the Nation, or at such other site as may be determined by the Nation in the event a site in the City of Buffalo is rejected by the Nation *658 for any reason . . .
“(b) With respect to the sites referenced in subparagraphs 11 (a) (1) and 11 (a) (2): . . .
“(3) The State shall support the Nation in its use of the procedure set forth in the [Settlement Act], to acquire restricted fee status for the site described in Appendix I and any other site chosen by the Nation pursuant to Paragraphs 11 (a) (1) and 11 (a) (2), to which the State has agreed, such agreement not to be unreasonably withheld . . .
“(4) The Nation agrees that it will use all but five million dollars ($5,000,000.00) of the funds remaining from amounts appropriated by the [Settlement Act] to acquire the parcels in the City of Niagara Falls and the City of Buffalo.” (Compact 1i 11 [a] [1], [2]; [b] [3], [4] [emphasis supplied].)
The interpretation of the language cited — from the MOU, Executive Law § 12 (a), and the Compact — is the crux of the instant litigation.
The Compact was submitted to Secretary of the Interior Gale A. Norton for her review in September 2002 (see Powers affidavit, sworn to on May 4, 2004, exhibit 13 [Letter of Secretary of DOI, dated Nov. 12, 2002 to Governor Pataki] [hereafter DOI Letter]). The Secretary determined in her letter of November 12, 2002 to the Governor and the president of the Seneca Nation to neither approve nor disapprove the Compact, rather to let it take effect without action .{see DOI Letter at 1). Under these circumstances, the Compact is considered to have been approved, “but only to the extent the compact is consistent with [IGRA]” (25 USC § 2710 [d] [8] [C]).
In the letter, under the heading of “General Observations,” the Secretary made the following comments:
“I fully support Indian gaming as envisioned by the drafters of IGRA . . . But I am also mindful that when tribes seek to game on off-reservation land, the State has a greater governmental interest in regulating tribal off-reservation gaming activities. Tribes are increasingly seeking to develop gaming facilities in areas far from their reservations, focusing on selecting a location based on market potential rather than exercising governmental jurisdiction on existing Indian lands. It is understandable that tribes who are geographically isolated may desire to look *659 beyond the boundaries of their reservation to take advantage of the economic opportunities of Indian gaming. However, I believe that IGRA does not envision that off-reservation gaming would become pervasive.
“Even with this concern in mind, I have concluded that this Compact appropriately permits gaming on the subject lands because Congress has expressly provided for the Nation to acquire certain lands pursuant to the Settlement Act.” (DOI Letter at 2 [emphasis supplied]).
The Secretary further states, in her discussion of the exclusivity and state revenue sharing provisions of the Compact:
“According to the economic analysis provided by the Nation, the total revenues currently anticipated from the gaming operations over the term of the Compact, exceed five billion dollars, of which the State would receive less than one billion dollars, and a portion of those State funds would go to local governments. The Nation estimates its anticipated return after all expenses to significantly exceed two billion dollars over the fourteen-year term of the Compact.” (DOI Letter at 4.)[7]
The Secretary also determined that the parcels of land to be acquired by the Seneca Nation under the Compact and the Settlement Act “will be exempt from the prohibition on gaming” on lands acquired after 1988, contained in 25 USC § 2719 (a), “because they are lands acquired as part of the settlement of a land claim, and thus fall within the exception in 25 USC § 2719 (b) (1) (B) (i)” (DOI Letter at 7).[8]
Following execution of the August 2002 Compact, negotiations commenced between the City of Buffalo and the Seneca Nation over the selection of a site (see Masiello affidavit, sworn to on May 13, 2004, KK 21-26). In October 2002, in tribal elections, the Seneca Nation elected a new president (see Seneca Gaming Corp. bond offering mem at 54). The record shows that, from September 2002 until April 2004, the City of Buffalo had *660 sites available for development of a casino (see Masiello affidavit HIT 21-25; Buchheit affidavit IT 5). Between September 2002 and April 2004, the City of Buffalo and the Seneca Nation failed to reach agreement on a facility location for the casino in the city.
In April 2004, published reports in the Buffalo News revealed that the Seneca Nation was contemplating a location for the Erie County casino in the Town of Cheektowaga, New York (see Powers affidavit, sworn to on May 3, 2004, exhibit 17). In an affidavit, Carl J. Montante, the president of the Corporate General Partner of Uniland, admits that Uniland entered into a nonbinding letter of intent for the sale of property in Cheektowaga (see Montante affidavit, sworn to on May 23, 2004, 1T 4 n 1). According to a Seneca Gaming Corporation (S.G.C.) bond offering memorandum, on April 9, 2004, the S.G.C. entered into a nonbinding letter of intent with Uniland to purchase approximately 57.1 acres near the Buffalo Niagara International Airport in the Town of Cheektowaga (see S.G.C. bond offering mem at 71).
According to the S.G.C. bond offering memorandum, the letter of intent provides that
“[the Nation’s] obligation to purchase this property will be subject to our satisfaction with the condition of the title, our ability to enter into a definitive purchase agreement, the failure of any relevant taxing jurisdiction to object to the property being placed in restricted fee for gaming by the [DOI] and Uni-land’s ability to enter into an agreement with the Town of Cheektowaga for various make whole benefits for Uniland. The purchase price for this property will be $15.0 million. In addition, we have agreed to retain Uniland as the construction manager for the construction of Seneca Erie Casino at an overhead and profit fee of 3.5% for the first $75.0 million of construction costs at the Cheektowaga site.” (S.G.C. bond offering mem at 71.)
On May 3, 2004, plaintiffs instituted the instant action, seeking a temporary restraining order. The request for temporary relief was thereafter withdrawn, when the parties negotiated a stand-still agreement and an expedited briefing schedule, memorialized in a stipulation and order entered under seal on May 5, 2004. On motion to intervene and/or appear as amicus curiae, Daniel T. Warren was granted the status of amicus curiae, and has filed a brief. Oral argument was heard on June 4, 2004.
*661 Discussion
I. All Parties Seek Summary Judgment
The court notes that a significant amount of evidence, consisting of affidavits, newspaper articles, and a certified transcript of legislative debates, has been submitted on the issue of the parties’ intent in entering into the two agreements at issue, and on the issue of the legislative intent behind Executive Law § 12. Because the court determines that neither the MOU nor the Compact is, to the extent at issue here, ambiguous, it is the court’s job to construe the two documents as a matter of law. Executive Law § 12, as well, is unambiguous on its face, as discussed herein. Therefore, much of the evidentiary material submitted by the parties is irrelevant to the decision, and has not been considered by the court.
Plaintiffs have moved for summary judgment, and all defendants have cross-moved for summary judgment. None of the parties seek discovery. “[W]here there are cross motions for summary judgment, in the absence of [any] party challenging the verity of the alleged facts, . . . there is, in effect, a concession that no question of fact exists” (Kuehne & Nagel v Baiden, 36 NY2d 539, 544 [1975]). The court has searched the record and finds no question of fact preventing summary judgment. Therefore, the court may resolve the matter consistent with its legal and equitable powers to grant declaratory and injunctive relief (see NY Const, art VI, § 7; CPLR 3001).
II. Plaintiffs’ Standing to Sue
The State contends that all of the plaintiffs lack standing to bring the action. Specifically, although plaintiffs assert that the individuals, Anthony Masiello and Carl P Paladino, the Huron Group, Inc. and the City all have standing to sue as citizen taxpayers or, in the case of the City, as a representative of citizen-taxpayers living in the city (see reply mem at 5-11), the State contends that the case lacks a sufficient nexus to state expenditures to establish such standing on behalf of any party (see State mem at 7-12; see also Uniland mem at 4-7).
State Finance Law § 123-b provides in pertinent part:
“Notwithstanding any inconsistent provision of law, any person, who is a citizen taxpayer, whether or not such person is or may be affected or specially aggrieved by the activity herein referred to, may maintain an action for equitable or declaratory relief, or both, against an officer or employee of the state who in the course of his or her duties has caused, is *662 now causing, or is about to cause a wrongful expenditure, misappropriation, misapplication, or any other illegal or unconstitutional disbursement of state funds or state property . . . (See State Finance Law § 123-b [1] [emphasis supplied].)
There is no requirement under that section that a plaintiff demonstrate an injury in fact (see id.; Saratoga III, 100 NY2d at 813). In addition, the section clearly permits standing to challenge threatened state action (see State Finance Law § 123-e [2]) and to seek “a declaration that a proposed disbursement or alienation of property would be illegal” (§ 123-e [1] [emphasis supplied]). In other words, plaintiffs need not wait until the expenditures of state funds have already been made to seek relief.
Concerning when standing under section 123-b should be recognized, the Court of Appeals stated:
“While the statute might be read to allow actions when little or no injury has been claimed, courts have been inhospitable to plaintiffs who seek essentially to challenge nonfiscal activities by invoking the convenient statutory hook of section 123-b . . . Accordingly, we have held that a plaintiff’s claims must have a ‘sufficient nexus to fiscal activities of the State’ in order to confer standing . . .
“[A] claim that state funds are not being spent wisely is patently insufficient to satisfy the minimum threshold for standing, but a claim that it is illegal to spend money at all for the questioned activity likely would provide the plaintiff with standing” (Saratoga III, 100 NY2d at 813-814 [citations omitted]).
Under that analysis, the Court of Appeals found standing for the citizen-taxpayers in Saratoga III (see id. at 815). An additional reason buttressed that determination by the Court of Appeals: if the Court denied standing to all of the plaintiffs, “an important constitutional issue would be effectively insulated from judicial review” (Saratoga III, 100 NY2d at 814).
Plaintiffs here challenge the expenditure of state funds for a casino in the Town of Cheektowaga or anywhere at all in Erie County outside of the City of Buffalo. The State attempts to distinguish Saratoga III, by interpreting plaintiffs’ stance as a challenge to a nonfiscal determination — the location of the casino — not a challenge to the expenditure of any funds at all for a casino in any location — and thus an insufficient basis upon *663 which to confer standing under State Finance Law § 123-b (see State mem at 10, citing Kennedy v Novello, 299 AD2d 605, 607 [3d Dept 2002], lv denied 99 NY2d 507 [2003]).[9] The court disagrees.
State Finance Law § 123-b provides standing to plaintiffs to bring an action of this nature to challenge allegedly unconstitutional or illegal expenditures of state funds contemplated to be expended under the MOU, Executive Law § 12 and the Compact, without regard to whether there is an alternative, legal expenditure of the same funds which plaintiffs do not or would not challenge. In light of the specific constitutional challenge to paragraph 11 (a) (2) of the Compact together with the actual or contemplated expenditures of state funds under the MOU, Executive Law § 12, State Finance Law § 99-h, and the Compact, the court determines that Huron Group, Inc., Anthony Masiello, individually, and Carl E Paladino have standing to bring the action under State Finance Law § 123-b.
Because some of the plaintiffs have standing to sue, the court need not pass on the issue whether the City of Buffalo and the mayor in his official governmental capacity also have standing outside of the State Finance Law (see Saratoga III, 100 NY2d at 813; see generally City of New York v State of New York, 86 NY2d 286, 291-292 [1995]).
III. Prematurity/Availability of Declaratory Relief
The State contends that the present action is premature. It contends that, because plaintiffs base their claims upon expenditures that the State may make in the future with respect to the operation of a casino in Cheektowaga by the Seneca Nation and because, before such payments would be made, a number of events beyond the State’s control would have to take place, the case is not ripe for this court’s review (see State mem at 12-19; see also Uniland mem at 7-10).
It is axiomatic that New York trial courts may not issue advisory opinions and that “[w]here the harm sought to be enjoined is contingent upon events which may not come to pass, the claim to enjoin the purported hazard is nonjusticiable as wholly *664 speculative and abstract” (Matter of New York State Inspection, Sec. & Law Enforcement Empls. v Cuomo, 64 NY2d 233, 240 [1984] [citations omitted]; see generally Cuomo v Long Is. Light. Co., 71 NY2d 349, 354 [1988]). Further, “a request for a declaratory judgment is premature if the future event is beyond the control of the parties and may never occur” (New York Pub. Interest Research Group v Carey, 42 NY2d 527, 531 [1977]).
The court determines that the instant action is not premature. A number of steps have already been taken toward the establishment of a third casino by the Seneca Nation in western New York. The Governor and the Seneca Nation executed the MOU. The Legislature passed enabling legislation. The Governor and the Seneca Nation executed a compact authorizing class III gaming. The United States Department of the Interior has tacitly approved the Compact. The Seneca Nation and Uniland entered into a letter of intent to transfer the property in Cheektowaga, and the Seneca Gaming Corporation issued a bond offering memorandum stating that it and the Seneca Nation are prepared to construct a casino in Cheektowaga.
Further, the Seneca Nation intends to use funds from the Settlement Act to purchase the property (see Compact 1i 11 [b] [3], [4]), as the Settlement Act permits land “within [the Nation’s] aboriginal area in the State or situated within or near proximity to former reservation land” to be acquired with those funds (25 USC § 1774f [c]). With respect to lands purchased with such funds, the Settlement Act provides:
“State and local governments shall have a period of 30 days after notification by the Secretary or the Seneca Nation of acquisition of, or intent to acquire such lands to comment on the impact of the removal of such lands from real property tax rolls of the State political subdivisions. Unless the Secretary determines within 30 days after the comment period that such lands should not be subject to the provisions of section 2116 of the Revised Statutes (25 USC 177), such lands shall be subject to the provisions of that Act and shall be held in restricted fee status by the Seneca Nation” (25 USC § 1774f [c]).
The State, however, asserts that for the property to be not only acquired by the Seneca Nation but “qualified” for gaming, the Secretary must fail to disapprove restricted fee status, which *665 determination is contingent upon the negotiation of a purchase agreement between the Seneca Nation and Uniland, notice to the State and to local governments, and a 30-day comment period, followed by a second 30-day period during which the Secretary may determine that the lands in question should not be subject to the Nonintercourse Act (see 25 USC § 177). The State asserts that none of the aforementioned steps is subject to the State’s control. Thereafter, the State asserts, should the Secretary agree that the lands should be subject to the Nonintercourse Act, the determination to take the land into restricted fee may be subject to federal judicial review under the Federal Administrative Procedure Act or the National Environmental Policy Act (see State mem at 16-17). Those potential developments, the State contends, render the action not ripe.
The court notes, however, the absence of evidence in the record that the notice to the State and local governments required under section 1774f (c) has not already been given, triggering the initial 30-day comment period. In addition, the Settlement Act allows the Seneca Nation to obtain property in restricted fee within an additional 30 days after the comment period if the Secretary does not act. Since the Secretary has already approved the Compact, and there is no indication that the Town will raise any objection to removal of the land from the tax rolls, it is conceivable that the comment period will pass without any municipal or federal action of any kind. Once that occurs, the Seneca Nation might purchase the land with Settlement Act funds, foreclosing the state court’s jurisdiction over the land and potentially rendering unreviewable the important state constitutional issues involved.
Thus, the court determines that the action is not premature.
IV The Seneca Nation Is Not an Indispensable Party
The State contends that the action cannot continue in the absence of the Seneca Nation, which cannot be made a party due to the Nation’s sovereign immunity (see Santa Clara Pueblo v Martinez, 436 US 49, 58 [1978]). The State further contends that the Seneca Nation is both necessary and indispensable to the action, because the action challenges the Compact to which the Seneca Nation is a party (see State mem at 20-27; see generally CPLR 1001). One of the arguments made includes the assertion that the court will have to review the Nation’s determination that no site was available in the City (see State mem at 25-26).
*666 The court disagrees with the State’s contention. The court’s resolution of the issues involved in this action does not require the presence of the Seneca Nation to resolve any issue of contractual intent or any factual dispute. The resolution of the case rests solely upon the court’s interpretation of the relevant unambiguous provisions of the MOU, Executive Law § 12, and the Compact, together with article III, § 1 and article IV § 1 of the New York Constitution.
In analogous circumstances, the Court of Appeals in Saratoga III determined that the Mohawk Tribe (the Tribe) was not an indispensable party to that action (see Saratoga III, 100 NY2d at 821). The Court stated:
“There are two principal purposes of requiring dismissal owing to the absence of an indispensable party. First, mandatory joinder prevents multiple, inconsistent judgments relating to the same controversy. Second, joinder protects the otherwise absent parties who would be ‘embarrassed by judgments purporting to bind their rights or interests where they have had no opportunity to be heard’ . . .
“Neither purpose applies here. The Tribe has chosen to be absent . . . While sovereign immunity prevents the Tribe from being forced to participate in New York court proceedings, it does not require everyone else to forego the resolution of all disputes that could affect the Tribe . . . While we fully respect the sovereign prerogatives of the Indian tribes, we will not permit the Tribe’s voluntary absence to deprive these plaintiffs (and in turn any member of the public) of their day in court” (Saratoga III, 100 NY2d at 820-821 [citations omitted]).
In this action, because the court determines that the MOU and the Compact are, so far as is relevant here, unambiguous, no extrinsic evidence of the intent of the contracting parties is admissible to add to or vary the terms of those agreements (see generally WWW Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]). Similarly, Executive Law § 12 can be interpreted by the court without resort to legislative history. Finally, resolution of the question of whether certain provisions contained in paragraph 11 (a) (2) of the Compact violate the principle of separation of powers under article III, § 1 and article iy § 1 of the New York Constitution rests solely with the state courts. The nonjoinder of the Seneca Nation to the action is excused (see Saratoga III, 100 NY2d at 821; CPLR 1001 [b]).
*667 V No Federal Preemption over the Questions at Issue
The State contends that this court lacks the power to order “reformation” of the Compact, because IGRA has completely preempted the area of regulation of gaming on Indian lands, and the Secretary of DOI has already “approved” the Compact (see State mem at 43-44). The State attempts to distinguish Saratoga III (100 NY2d 801 [2003]) by asserting that, in that case, the issue of whether the Governor had the capacity to enter into the Compact was not preempted by federal law, whereas in this case, whether certain terms of the Compact may be stricken requires the application of federal law (see State mem at 43). The Court disagrees.
IGRA provides that “Class III gaming activities shall be lawful on Indian lands only if such activities are,” inter alia, “(C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under [section 2710 (d) (3)] that is in effect” (25 USC § 2710 [d] [1] [C] [emphasis supplied]). Further, IGRA “describes the permissible scope of a Tribal-State compact” (Seminole Tribe of Fla. v Florida, 517 US 44, 49 [1996], quoting 25 USC § 2710 [d] [3] [C]). As noted, IGRA provides that a compact may include provisions relating to the application of criminal and civil laws and regulations of the Tribe and the State, the allocation of jurisdiction between the State and the Tribe to enforce such laws, and numerous other subject matters including “any other subjects that are directly related to the operation of gaming activities” (25 USC § 2710 [d] [3] [C] [vii]).
Notwithstanding those provisions of IGRA, federal appeals courts have held that IGRA completely preempts the area of the regulation of gaming on Indian lands (see Gaming Corp. of Am. v Dorsey & Whitney, 88 F3d 536, 547 [8th Cir 1996]). That “complete preemption,” however, does not negate the applicability of state constitutional and statutory law to issues involving the execution of a Tribal-State compact, a mechanism which IGRA specifically creates “for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of State jurisdiction and the application of state laws to activities conducted on Indian land” (Senate Rep No. 446, 100th Cong, 2d Sess, at 5-6 [1988], reprinted in 1988 US Code Cong & Admin News, at 3071, 3075-3076, quoted in Gaming Corp., 88 F3d at 545).
*668 In Saratoga I, the Third Department determined that the issue of the Governor’s authority to enter into a Tribal-State compact was not preempted by federal law (see Saratoga I,275 AD2d at 157). The Court of Appeals in Saratoga III held that IGRA “does not preempt state law governing which state actors are competent to negotiate and agree to gaming compacts” (Saratoga III, 100 NY2d at 822), and a federal Court of Appeals has held that “[s]tate law must determine whether a state has validly bound itself to a compact” (Pueblo of Santa Ana v Kelly, 104 F3d 1546, 1557 [10th Cir 1997], cert denied 522 US 807 [1997]).
The issues raised here — whether the Legislature, pursuant to its authority under article III, § 1 of the New York Constitution, in its enactment of Executive Law § 12, limited the authority of the Governor to enter into a compact with the Seneca Nation consistent with the MOU and did not authorize or delegate to the Governor any legislative policy-making power concerning any alternative municipal location for the City of Buffalo casino — are issues of state constitutional law not preempted by IGRA, other federal statutory or common law.
VI. The Location of the Erie County Casino Falls Within the Province of the Legislature
There is a unique conjunction of intertwining state, federal and Seneca Nation jurisdiction over the issue of where a casino may be located in New York State. Plaintiffs contend that the decision to locate a casino in a particular municipality is a matter committed to the New York State Legislature under article III, § 1 of the New York Constitution, in the exercise of its policy-making power (see plaintiffs’ mem at 25). Defendants do not seriously contest that contention, after Saratoga II and III.
In Saratoga II, the Third Department determined that “the Governor lacked authority to define the terms” of a compact (293 AD2d 20, 25 [3d Dept 2002], affd as mod 100 NY2d 801 [2003]). Concerning the Governor’s action in entering into a Compact that had not been authorized by the Legislature, the Third Department stated further:
“Here, the Governor’s action deprived the Legislature of any input concerning a number of significant elements, including the location of the casino, the gaming that could be carried on there, the extent of state involvement in providing regulation and a regulatory infrastructure and the fees to be *669 exacted for that regulation . . . These numerous collateral issues affecting the health and welfare of state residents implicate policy choices lying squarely within the province of the Legislature (Sara-toga II, 293 AD2d at 26 [emphasis supplied]).[10]
In Saratoga III, Governor Cuomo had negotiated a Tribal-State compact with the Mohawk Tribe without legislative authorization. The Court of Appeals held:
“It. . . falls to the courts ... to determine whether a challenged gubernatorial action is ‘legislative’ and therefore ultra vires. In this case we have no difficulty determining that the Governor’s actions were policymaking, and thus legislative in character . . . “Congress provided that potential conflicts may be resolved in the compact itself, explicitly noting the many policies affected by tribal gaming compacts. Indeed, gaming compacts are laden with policy choices, as Congress well recognized . . .
“Compacts addressing these issues necessarily make fundamental policy choices that epitomize ‘legislative power.’ Decisions involving licensing, taxation and criminal and civil jurisdiction require a balancing of differing interests, a task the multimember, representative Legislature is entrusted to perform under our constitutional structure . . .
“[E]very state high court to consider the issue has concluded that the state executive lacks the power unilaterally to negotiate and execute tribal gaming compacts under IGRA . . . Today we join those states in a commitment to the separation of powers and constitutional government” (Saratoga III, 100 NY2d at 822-824).
In light of Saratoga II and III, the court agrees that the decision concerning where a casino is to be located is a matter of public policy lying squarely within the province of the Legislature (see Saratoga III, 100 NY2d at 822-823; Saratoga II, 293 AD2d at 26). Practically speaking, the municipal location of the class III gaming casinos is the crux of the legislative policymaking involved in casino gambling, given the estimated $4 billion *670 of income by the Seneca Nation and the resulting significant monetary benefits to the host municipalities.[11] To argue otherwise is to ignore the political and fiscal realities of site selection for gaming casinos as reflected by the Court of Appeals in Saratoga III.
This case is the expected progeny of Saratoga. Unlike in Sara-toga III, the Legislature in this case enacted legislation enabling the execution of a compact by the Governor “consistent with” the June 20, 2001 MOU (see MOU at 6; Executive Law § 12 [a]). Therefore, the task of the court is to determine if a municipal location in the Town of Cheektowaga has been authorized by the New York State Legislature. To do so, the court must first construe the relevant provisions of the MOU, Executive Law § 12, and the Compact; and then, only if necessary, address the constitutional question raised by plaintiffs: whether a portion of paragraph 11 (a) (2) of the Compact violates the principle of separation of powers under article III, § 1 and article iy § 1 of the New York Constitution.
A. The MOU and the Compact
The State and the Town contend that the location selection provisions in the MOU and in the Compact are consistent, as required by Executive Law § 12 (see State mem at 36-39; Town mem at 8-14). Plaintiffs, on the other hand, submit extrinsic evidence of the Governor’s public announcement that he was authorized by the Legislature to execute a compact locating a casino in the City of Buffalo (see Powers affidavit, sworn to on May 13, 2004, exhibit 10), and that the Seneca Nation also made a similar announcement. Plaintiffs contend that that evidence proves conclusively that the New York State Legislature did not authorize a casino to be operated in Cheektowaga (see plaintiffs mem at 31). However, the court need not consider that “extrinsic” evidence because it finds, as a matter of interpretation, that the MOU and the Compact are clearly contradictory on the critical issue of municipal location of the casinos, for the reasons described below.
(i) The MOU
The MOU contains a provision entitled “Location of Facilities,” which provides in relevant part: “[4.] . . . The Parties agree that the Compact shall authorize the establishment of a *671 Class III gaming facility at locations in Niagara County in the City of Niagara Falls and in Erie County in the City of Buffalo.” (MOU at 1-2 [emphasis supplied].)
The meaning of the MOU on the issue of the municipal locations of the three casinos is clear and unambiguous without resort to extrinsic evidence (see generally W.W.W. Assoc. v Giancontieri, 77 NY2d at 162). “The proper inquiry in determining whether a contract is ambiguous is whether the agreement on its face is reasonably susceptible of more than one interpretation” (Jellinick v Joseph J. Naples & Assoc., 296 AD2d 75, 78 [4th Dept 2002] [internal quotation marks omitted]). Under the terms of the MOU, the parties agreed that casinos would be built in the City of Niagara Falls, the City of Buffalo, and on the Seneca Nation Reservation, and that the “compact shall authorize” those locations (MOU at 1).
As to a particular facility or site location within the municipal location, for the casinos in the cities of Niagara Falls and Buffalo, the MOU states:
“With respect to the facility in the City of Niagara Falls, the Nation agrees that it will be located on the parcel of land designated in the attached map of downtown Niagara Falls [Footnote 2]. With respect to the facility in the City of Buffalo, the Nation has not yet decided upon an appropriate parcel of land suitable for development of the facility. [Footnote 3.]” (MOU at 1-2 [emphasis supplied]).
This language is followed by footnote 3, which states: “In the event a site in the City of Buffalo site [sic] is not available for any reason, the Nation would propose an alternate site.” (MOU at 2 n 3 [emphasis supplied].)
In construing the operative language of the MOU cited above, it is important to recognize that the document addresses three distinct location concepts. The MOU distinguishes between the concepts of municipal location of the casino and that of a facility location or site within a given municipal location. In addition, the MOU articulates the ability of the Seneca Nation, in the event that “a site in the City of Buffalo site [sic]” is unavailable for any reason, to “propose” an alternate site. Each of those concepts requires separate analysis.
The MOU recites in the “Location of Facilities” clause that “[t]he Parties agree that the Compact shall authorize the establishment of a Class III gaming facility ... in the City of Buffalo.” (MOU at 1.) The “Location of Facilities” clause clearly *672 states that the Compact shall authorize the establishment of a class III gaming facility in the City of Buffalo.
The next location concept appearing in the MOU is that of facility location within a municipal location. The MOU recites: “With respect to the facility in the City of Buffalo, the Nation has not yet decided upon an appropriate parcel of land suitable for development of the facility.” (MOU at 2.) That language clearly and unambiguously recites the municipal location of the casino facility to be in the City of Buffalo, while at the same time stating that the Seneca Nation has not yet decided upon a facility location (or site) within the City of Buffalo. It is that language of the MOU which is referenced by footnote 3, which recites: “In the event a site in the City of Buffalo site [sic] is not available for any reason, the Nation would propose an alternate site.” (MOU at 2 n 3.)[12]
Footnote 3 is clearly designed to address the issue of what happens if a facility site chosen by the Nation in the City of Buffalo is unavailable “for any reason.” In such instance, the MOU enables the Seneca Nation to “propose” an alternate site.[13] In no instance does any provision of the MOU, including footnote 3, authorize or empower the Seneca Nation to “select” or “choose” an alternate site outside of the City of Buffalo.
Consistent with the plain and ordinary meaning of the word “propose,” which means to put forward for consideration, or to offer (see, supra n 13), the court construes footnote 3 of the MOU as enabling the Seneca Nation to propose an alternate site, outside of the City of Buffalo, in the event “a site in the City of Buffalo site [sic] is unavailable for any reason.”
The next issue raised by the parties concerning footnote 3 is to whom the Nation must propose an alternate site. The court recognizes that footnote 3 is silent on this issue. Each of the parties have advanced propositions as to whom, and the manner *673 in which, the proposal is to be made by the Seneca Nation. The issue merits the court’s consideration in light of state and federal approvals needed to establish a class III gaming facility under IGRA.[14]
Plaintiffs maintain that the provision mandates that the Seneca Nation propose an alternate site to the State Legislature via amendment of Executive Law § 12 (a) or another piece of enabling legislation. The State of New York advances the argument that the Seneca Nation may directly propose an alternative site to the Secretary of the Interior. Addressing the contentions of the plaintiffs and the State requires the court to address the sequence of events leading to the creation of the MOU, the enabling legislation and the Compact, together with the purpose of each separate activity.
The MOU was executed on June 20, 2001 by the Governor and the Seneca Nation as a memorandum outlining the material provisions which would be contained in the Compact (MOU at 1 n 1). However, as recognized within the ratification provision of the MOU:
“Because of the uncertainties caused by the case Saratoga Chamber of Commerce v Pataki, ... it is mutually agreed that the Parties will jointly seek timely (1) legislative authorization for the Governor to execute a Tribal-State Compact with the Seneca Nation consistent with this Memorandum of Understanding-, and, (2) ratification of the Compact by the enrolled members of the Nation and the United States Department of the Interior” (MOU at 6 [emphasis supplied]).
Thus, one purpose of the MOU was to define for the Legislature the material provisions of the proposed Compact in order to secure legislative authorization for the Governor, in light of the ruling on August 24, 2000 in Saratoga I (275 AD2d 145 [2000]) and the subsequent decision and order on April 12, 2001 by the Supreme Court, Albany County, declaring a Tribal-State compact to be “void and unenforceable absent legislative approval” (Saratoga II, 293 AD2d at 20 [reciting content of trial court order]).
*674 The enabling legislation reflected in Executive Law § 12 was enacted by the Legislature effective October 2001. As recited in the text of Executive Law § 12, the Legislature authorized the Governor to execute a Tribal-State compact with the Seneca Nation consistent with the terms of the MOU. In light of Sara-toga III, which was decided by the Court of Appeals in June 2003 — well after execution of the Compact at issue here — absent that legislative action, the State of New York, through the Governor, would not have been authorized to enter into the Compact. However, once authorized by the Legislature, the State of New York through the Governor was empowered to enter into a compact consistent with the MOU (which was accomplished on August 18, 2002) and seek ratification thereof from the Secretary of the Interior.
As previously mentioned, the Secretary of the Interior tacitly approved the Compact in her letter of November 12, 2002 (see DOI Letter at 1). That approval of the Compact, coupled with subsequent DOI approvals as required under federal law, will eventually enable the Nation to begin development and construction of the gaming facility.
With the sequence of events and purposes in mind, the court now turns its attention to the issue of interpreting footnote 3 of the MOU: that is, to whom and in what manner the Seneca Nation “may propose an alternative site.” In the view of this court, the Nation must initially propose an alternate site, if outside the City of Buffalo, to the State, which must act upon it consistent with the principle of separation of powers and, once the issue has been passed upon by the State, then the Nation must seek the approval of the Secretary of the Interior. This, of course, is the same approval mechanism as was utilized by the Governor, the Seneca Nation, the Legislature, and the Department of the Interior initially in seeking establishment of the casinos at issue in this action.
The implementation of IGRA by the State and Seneca Nation requires detailed attention to the interplay among issues of state sovereignty, state executive and legislative authority, federalism, and the sovereignty of Indian Nations (see Saratoga III, 100 NY2d at 821-824; Bourquin v Cuomo, 85 NY2d 781, 784-785 [1995]; Saratoga II, 293 AD2d at 23-27). This is the essence of the holdings of a series of federal and state cases, including the Court of Appeals decision in Saratoga III, which recognize the interplay among various approvals needed to establish a class III casino under IGRA. Under the IGRA *675 framework, coupled with case law which recognizes the authority of the States to address location issues (see Saratoga III, 100 NY2d at 810; Saratoga II, 293 AD2d at 26), the intricate and interwoven IGRA process of federal and state considerations (coupled with judicial determination of state constitutional considerations) mandate that all steps in the process be understood and followed by state, nation, and federal officials, seeking establishment of a class III gaming casino.
Within the context of the IGRA and its attendant federal and state considerations, therefore, the court determines that proposal by the Seneca Nation of an alternate site, under footnote 3 of the MOU, must of necessity be made to the State of New York consistent with the principles governing separation of powers (see NY Const, art III, § 1; art IV, § 1). Once necessary state action is secured, both the State and the Nation may propose an alternate site to the Secretary of the Interior for its regulatory consideration.
The court explicitly rejects the State’s contention that the Nation’s proposal must, under circumstances where a desired site is unavailable, be made directly to the Secretary of the Interior without state action. The court rejects this interpretation because it ignores the issue of the public policy-making authority of the Legislature to authorize the establishment of class III gaming casinos in New York State (see Saratoga II, 293 AD2d at 26). Similarly, in this action, the State ignores the ratification provision of the MOU, which expressly requires legislative authorization for the Governor to execute a Tribal-State compact with the Seneca Nation consistent with the MOU, as well as language of Executive Law § 12 itself. Simply stated, absent legislative enactment of Executive Law § 12 or other state enabling legislation, there is no compact for the Governor and the Seneca Nation to execute or for the Secretary of the Interior to approve.
Finally, the court must reiterate that the authority of the Seneca Nation to “propose” an alternate site under the MOU means just that: the Seneca Nation could propose an alternate municipal site to the State, but not select or choose an alternate municipal site unless permitted to do so by the MOU and by Executive Law § 12. To construe the word “propose” to mean “select” or “choose” would not only ignore the plain and ordinary meaning of the word, but also divest the Legislature of its sovereign policy-making authority under article III, § 1 of the New York Constitution.
*676 The court construes the language of the MOU as requiring the Seneca Nation to “propose” an alternate site to the State. Article III, § 1 of the State Constitution supplies the remaining term: should that alternate site be outside of the City of Buffalo, the Seneca Nation and the Governor must obtain legislative authorization for that location. With such legislative authority, the Seneca Nation would then be empowered to select an alternate municipal location.
B. Interpretation of Executive Law § 12
The court must now consider the meaning of the term “consistent with” as used by the Legislature in Executive Law § 12 (a). To assist in that task, plaintiffs have submitted a certified transcript of a New York State Senate debate on chapter 383 of Laws of 2001 (see Powers reply affidavit, exhibit C).
The State, however, contends that legislative history is inadmissible here to interpret the meaning of Executive Law § 12, because the statute is clear on its face. Prior case law indicates: “Where the statute is clear and unambiguous on its face, the legislation must be interpreted as it exists. Absent ambiguity the courts may not resort to rules of construction to broaden the scope and application of a statute” (Bender v Jamaica Hosp., 40 NY2d 560, 561-562 [1976]). “It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature, and where the statutory language is clear and unambiguous, the court should construe it so as to give effect to the plain meaning of the words used” (Patrolmen’s Benevolent Assn. of City of N.Y. v City of New York, 41 NY2d 205, 208 [1976] [citations omitted]; Doctors Council v New York City Employees’ Retirement Sys., 71 NY2d 669, 674-675 [1988]; see Desiderio v Ochs, 100 NY2d 159, 172 [2003]; Civil Serv. Empls. Assn. v County of Oneida, 78 AD2d 1004 [4th Dept 1980], lv denied 53 NY2d 603 [1981]).
A second reason for excluding the legislative debate from consideration is the nature of the comments included therein. The State cites Woollcott v Shubert (217 NY 212 [1916]):
“In construing a statute [the court has] a right to consider relevant conditions existing when it was adopted . . . The particular mischief it was designed to remedy and the history of the period and of the statute itself may be considered ... A court is at liberty, also, to invoke, as an aid in construction, the history of the passage of a statute, that is, the changes and proposed changes in the original bill, *677 as recorded in the legislative journals ... It is established law, however, that the statements and opinions of legislators uttered in the debates are not competent aids to the court in ascertaining the meaning of statutes” (Woollcott, 217 NY at 220-221 [emphasis supplied and citations omitted]).
More recently, the Court of Appeals held that, although legislative debates, among other legislative documents, “ ‘may be accorded some weight in the absence of more definitive manifestations of legislative purpose’ . . . such indicators of legislative intent must be cautiously used” (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 585 [1998] [citation omitted]), because “[t]hose who did not speak may not have agreed with those who did, and those who spoke might differ from each other” (United States v Trans-Missouri Frgt. Assn., 166 US 290, 318 [1897]).
Therefore, although the transcript of the New York State Senate debate in question may be probative, the court concludes that it is inadmissible on the issues upon which it has been offered. The court will instead interpret the plain language of the statute, “consistent with” the MOU.
The State supplies various dictionary definitions of the term “consistent with.” The court relies upon Black’s Law Dictionary 308 (6th ed), which provides: “Consistent. Having agreement with itself or something else; accordant; harmonious; congruous; compatible; compilable; not contradictory.” (Emphasis added.) The court considers, therefore, whether the MOU and the compact are “consistent with” or “harmonious with” each other or “contradictory” on the issue of location.
C. The MOU and Paragraph 11 (a) (2) of the Compact are Contradictory on the Issue of the Authority of the Seneca Nation to Determine the Municipal Location of the Casino
The provisions of the “Location of Facilities” clause of the MOU, and the first clause of paragraph 11 (a) (2) are consistent with each other on the issue of the municipal location of the Erie County casino in the City of Buffalo. The MOU recites:

“Location of Facilities . . .

“The parties agree that the Compact shall authorize the establishment of a Class III gaming facility ... in the City of Buffalo.”
Footnote 3 of the MOU recites: “In the event a site in the City of Buffalo site [sic] is not available for any reason, the Nation shall propose an alternate site.”
*678 Paragraph 11 (a) (2) of the Compact recites:
“(a) Subject to the provision of this paragraph 11, the Nation may establish Gaming Facilities: . . .
“(2) in Erie County, at a location in the City of Buffalo ...” (Compact II11 [a] [2]).
After specifying the City of Buffalo as the municipal location of the casino, paragraph 11 (a) (2) of the Compact further states: “or at such other site as may be determined, by the Nation in the event a site in the City of Buffalo is rejected by the Nation for any reason.” (Id.)
Paragraph 11 (a) (2) of the Compact clearly does not require that the Nation “propose” and obtain approval from New York State in order to select a location outside of the City of Buffalo. It provides that
“the Nation may establish Gaming Facilities . . . “(2) in Erie County, at a location in the City of Buffalo to be determined by the Nation, or at such other site as may be determined by the Nation in the event a site in the City of Buffalo is rejected by the Nation for any reason ...” (Compact II11 [a] [2] [emphasis supplied]).
Thus, under the provisions of paragraph 11 (a) (2) of the Compact, the Governor agreed to permit the Nation to “determine” the site of the casino in Erie County, should it reject the municipal location of the City of Buffalo “for any reason.”
While the MOU is silent on the issue of New York State approval of any alternate municipal casino site outside of the City of Buffalo, paragraph 11 (b) (3) of the Compact addresses the issue thus:
“(3) The State shall support the Nation in its use of the procedure set forth in the [Settlement Act], to acquire restricted fee status for the site described in Appendix I and any other site chosen by the Nation pursuant to Paragraphs 11 (a) (1) and 11 (a) (2), to which the State has agreed, such agreement not to be unreasonably withheld ...” (Compact II11 [b] [emphasis supplied]).
Thus for the specific purpose described in paragraph 11 (b) (3) of the Compact, the State of New York must agree to any site chosen by the Seneca Nation pursuant to paragraph 11 (a) (2) of the Compact, if the State is to be bound by the obligations imposed under the paragraph. The use of the word “shall,” as contrasted to the use of the word “may” in paragraph 11 (a) (2) *679 of the Compact, establishes the duty of the State, subject to the other provisions of the paragraph, to assist the Seneca Nation in acquiring restricted fee status for any site chosen by the Nation. It is a mandatory obligation (see McKinney’s Cons Laws of NY, Book 1, Statutes § 177).
Presumably, paragraph 11 (b) (3) of the Compact was added to provide the Seneca Nation with needed state assistance (legal or otherwise) in securing fee title to the site approved by the State. Given the anticipated complexity of securing fee title for the municipal casino site in Niagara County (as reflected in the MOU) and Erie County (as reflected in the variety of private or public sites available [see Masiello affidavit 1Í1Í 21-26]), the provisions of paragraph 11 (b) (3) mandate that the Seneca Nation seek site approval from the State.
The provisions of paragraph 11 (b) (3) are relevant to the court’s analysis of the need for state approval of a site chosen by the Seneca Nation, if only for the purposes described therein. In the absence of state agreement on a site, the State of New York is under no mandatory obligation to support the Seneca Nation in its use of the procedures set forth in the Settlement Act to acquire restricted fee status for the site.
Thus, should the Seneca Nation choose a site not agreed to by the State of New York, it would be doing so at its own legal peril, in terms of needed state assistance in securing restricted fee status for the site. While the purposes of paragraph 11 (a) (2) and (b) (3) are different and reconcilable, the above analysis clearly illustrates the difficulties of the Seneca Nation unilaterally implementing any change in the site of the Buffalo casino without state approval.
Paragraph 11 (a) (4) of the Compact recites: “The Nation agrees that it will use all but $5 million of the funds remaining from that appropriated by the Seneca Settlement Act to acquire the parcels in the City of Niagara Falls and the City of Buffalo.” (MOU at 3 [emphasis supplied].) The court construes the provision as a clear contractual obligation to use the proceeds of the Settlement Act to acquire a facility site in the City of Buffalo. Utilization of the Settlement Act proceeds to acquire a parcel outside the City of Buffalo would be inconsistent with paragraph 11 (a) (4) of the Compact and the MOU.
When the MOU was executed on June 20, 2001, the Governor and the Seneca Nation in the ratification clause expressly recognized the need for legislative authorization to empower the Governor to execute a compact consistent with the MOU. *680 The Legislature in its enactment of Executive Law § 12 authorizing the Governor to enter into a compact consistent with the MOU, as it relates to the City of Buffalo casino, was passing upon three distinct location concepts expressly addressed in the MOU, to wit: designation of a municipal location in the City of Buffalo; a facility location within the City of Buffalo; and the ability of the Nation, in the event that a site in the City of Buffalo was unavailable for any reason, to propose an alternate site.
Thus, the Legislature in its enactment of Executive Law § 12, authorizing the Governor to execute a compact consistent with the MOU, specifically passed on the three distinct locations concepts addressed in the MOU (see Brown affidavit 1Í 7). Accordingly, the provisions of Executive Law § 12 (a) mandate that the compact be consistent with the provisions of the MOU on the critical issue of municipal casino site location.
D. The State Constitutional Question
The court is cognizant of its judicial obligation not to pass upon constitutional questions submitted to it for consideration where other avenues of relief are available for the court to resolve a dispute (see Matter of Clara C. v William L., 96 NY2d 244, 250 [2001]). If the issue before the court were limited solely to interpretation of the relevant provisions of the MOU or of the Compact, the resolution of the constitutional question would not be necessary. However, the holdings of the Saratoga cases compel the court to address the issue of separation of powers under article III, § 1 and article IV § 1 in light of the Legislature’s enactment of Executive Law § 12.
Plaintiffs assert that the language of Executive Law § 12, enabling the execution of a Tribal-State compact “consistent with” the MOU, requires that, to the extent that Executive Law § 12 authorizes a municipal location for casinos in Erie County in the City of Buffalo, the municipal locale may not be changed by the Governor or any of his designees, to a different municipal locale. Such actions, plaintiffs assert, raise questions concerning the principle of the separation of powers.
The enactment of Executive Law § 12 authorizing the Governor to execute a compact consistent with the MOU constitutes legislative authority pursuant to article III, § 1 of the New York Constitution. That section provides that “[t]he legislative power of this state shall be vested in the senate and assembly.” As recognized in Saratoga III, under our State Constitution, “the separation of powers ‘requires that the Legislature make *681 the critical policy decisions, while the executive branch’s executive responsibility is to implement those policies’ ” (Saratoga III, 100 NY2d at 821-822, quoting Bourquin v Cuomo, 85 NY2d 781, 784 [1995]).
Earlier, the Court of Appeals had stated in Clark v Cuomo, “It is only when the Executive acts inconsistently with the Legislature, or usurps its prerogatives, that the doctrine of separation is violated.” (Clark, 66 NY2d 185,189 [1985].) “[T]he Legislature cannot delegate its authority and pass on its lawmaking functions to other bodies or communities. It cannot abdicate its constitutional powers and duties” (Matter of Mooney v Cohen, 272 NY 33, 37 [1936], mot to amend remittitur granted on other grounds 272 NY 597 [1936]).
The issue for the court to determine is whether the Governor negotiated a compact provision in which the Seneca Nation may choose to locate its Erie County casino outside of the City of Buffalo and, if so, has the Governor “act[ed] inconsistently with the Legislature” or “usurp[ed] its prerogatives” (Clark, 66 NY2d at 189).
Notably, with respect to the absence of the Seneca Nation from the action, the determination of inconsistency or usurpation of powers by the Governor does not implicate the rights or sovereignty of the Seneca Nation (see Saratoga III, 100 NY2d at 820-821).
The “Location of Facilities” provision of the MOU clearly recites that the Governor and the Seneca Nation agree that the Compact shall authorize the establishment of a class III gaming facility in the City of Buffalo. Footnote 3 of the MOU provides the Seneca Nation with the ability to propose an alternate site in the event a site “in the City of Buffalo site [sic]” is unavailable for any reason.
The second clause of paragraph 11 (a) (2), however, accomplishes much more than recognizing the ability of the Seneca Nation to propose an alternate site. The relevant clause of paragraph 11 (a) (2) at issue authorizes the Seneca Nation to determine another municipal and facility site, outside the City of Buffalo, in the event a site in the City of Buffalo is rejected by the Nation for any reason. This provision of paragraph 11 (a) (2) is clearly inconsistent with the MOU in two material respects.
The MOU recites that the Governor and the Seneca Nation agree the Compact shall authorize the establishment of a class *682 III gaming casino in the City of Buffalo. To the extent footnote 3 of the MOU addresses the issue of establishment of an alternative municipal location outside the City of Buffalo, the ability of the Nation is limited to that of proposing, not selecting, an alternate site. No provision of the MOU or Executive Law § 12 authorizes or delegates the issue of municipal site location or a change in municipal site location to either the Governor or the Seneca Nation. The location provision of the MOU and the second clause of paragraph 11 (a) (2) are contradictory on the issue of the authority of the Seneca Nation to determine a change in the municipal location of the Erie County casino.
The enabling legislation contained in Executive Law § 12 authorized the Governor to execute a compact consistent with the MOU. Simply put, there is an express absence of legislative authority in Executive Law § 12 to authorize or delegate the critical legislative policy decision of a change in the municipal location of the City of Buffalo casino, to the Seneca Nation, in the event of its rejection of a site in the City of Buffalo (see MOU at 2 n 3). The Legislature did not, in its enactment of Executive Law § 12, authorize the Governor to choose an alternate municipal site for the Buffalo casino in the Compact or delegate the issue of alternative municipal location of the Buffalo casino to the Seneca Nation.
In the court’s view, once the New York State Legislature approved the original municipal site of the Buffalo casino in enacting Executive Law § 12, only the Legislature, through amendment of the provision, or other enabling legislation, is empowered to change the municipal location.
Thus, the court determines consistent with the doctrine of separation of powers under article III, § 1 and article iy § 1 of the New York Constitution, that the determination of the municipal location of the casino in the County of Erie, City of Buffalo, constituted a pohcy-making choice of the New York State Legislature, thereby requiring the enactment of Executive Law § 12 (a) (see Saratoga III, 100 NY2d at 822-823; Saratoga II, 296 AD2d at 25-26). The court further determines, consistent with the doctrine of separation of powers, that any change in the municipal location of the casino in Erie County, outside of the City of Buffalo, is also a policy-making choice of the New York State Legislature which requires legislative authorization through amendment of Executive Law § 12 or other enabling legislation.
For the foregoing reasons, the court determines that so much of paragraph 11 (a) (2) of the Compact which authorizes the *683 Seneca Nation to select a municipal location for the casino in Erie County, other than the City of Buffalo, violates the principle of separation of powers under article III, § 1 and article IV § 1 of the New York Constitution (see Saratoga III, 100 NY2d at 822-823). Accordingly, the court declares so much of paragraph 11 (a) (2) of the Compact which recites, “or at such other site as may be determined by the Nation in the event a site in the City of Buffalo is rejected by the Nation for any reason” to be unconstitutional under article III, § 1 of the New York Constitution and thereby null and void. The court will address the remedy for the constitutional infirmity later in this decision.
VII. Certification by the Governor Does Not Provide Ratification by Legislature of Terms Inconsistent With the MOU, Except as Provided in Executive Law § 12
The State contends that because the Compact has been certified by the Governor, pursuant to the Legislature’s grant of authority to him, the terms of the Compact must be deemed to have been approved by the Legislature (see State mem at 28-31). For the reasons recited below, the court disagrees.
The language of Executive Law § 12, providing for the Governor’s certification, is as follows:
“Notwithstanding any other law, the state, through the governor, may execute a tribal-state compact with the Seneca Nation of Indians pursuant to the [IGRA] consistent with [the] memorandum of understanding . . . Such tribal-state compact shall be deemed ratified by the legislature upon the governor’s certification to the temporary president of the senate, the speaker of the assembly, and the secretary of state, that such compact, through its terms, by a memorandum of understanding or other agreement between the state and Nation, by a Nation’s ordinance or resolution, by statute, by executive order, or by the terms of any other agreement entered into by or on behalf of the Nation, provides [certain assurances concerning labor unions, a civil recovery system and liability insurance coverage]” (Executive Law § 12 [a] [emphasis supplied]).
By letter dated August 18, 2002, the Governor provided the Legislature and the Secretary of State with the certification recited in Executive Law § 12 (a) (see Sullivan affirmation, exhibit A).
The language of Executive Law § 12 (a) requires not only that the Governor certify that the compact encompasses certain as *684 surances concerning labor unions, tort liability and insurance, but also that the Governor certify that the compact is consistent with the MOU. The statute provides that “the state, through the governor, may execute a tribal-state compact with the Seneca Nation of Indians pursuant to the [IGRA] . . . consistent with a memorandum of understanding” and that “[s]uch tribal-state compact” — one that is consistent with the MOU— shall be deemed ratified by the Legislature upon proper certification by the Governor (see Executive Law § 12 [a] [emphasis supplied]). In other words, should the Governor certify to the Legislature a compact that is inconsistent with the MOU but that encompasses the required labor, tort and insurance provisions, such a compact will not be deemed to have been ratified.
Thus, the certification by the Governor to the Legislature on August 18, 2002 cannot remedy the constitutional infirmity of that portion of paragraph 11 (a) (2) which delegates to the Seneca Nation the Legislature’s policy-making choice of municipal site selection for class III gaming casinos. For the reasons recited above, the court determines that the Legislature only empowered the Governor to enter into a compact with the Seneca Nation consistent with the MOU.
However, even if the certification provision of Executive Law § 12 (a) were to be construed as a delegation by the New York State Legislature of its policy-making power, such delegation would be of constitutional concern as violative of the principle of separation of powers recognized by the Court of Appeals in Saratoga III: “the separation of powers ‘requires that the Legislature make the critical policy decisions, while the executive branch’s responsibility is to implement those policies’ ” (Saratoga III, 100 NY2d at 821-822, quoting Bourquin v Cuomo, 85 NY2d 781, 784 [1995]). “[T]he Legislature cannot delegate its authority and pass on its law-making functions to other bodies or communities. It cannot abdicate its constitutional powers and duties” (Matter of Mooney v Cohen, 272 NY 33, 37 [1936], mot to amend remittitur granted on other grounds 272 NY 597 [1936]).
Further, the Court of Appeals discussed in another case the issue of delegation of policy-making powers by the Legislature: “A check-and-balance in the distribution of powers is that the legislative branch may not delegate away its fundamental lawmaking powers or policymaking choices.” (Matter of Citizens for Orderly Energy Policy v Cuomo, 78 NY2d 398, 410 [1991].)
In light of the court’s interpretation of the certification provision of Executive Law § 12, which rejects the State’s argument *685 on ratification, the court is not required to pass upon this constitutional issue.
VIII. Severability
Plaintiffs contend that, to the extent paragraph 11 (a) (2) of the Compact can be read to authorize an Erie County casino outside Buffalo, it is invalid as unconstitutional (see Saratoga III, 100 NY2d at 824), and such provision must be severed from the Compact (see plaintiffs’ mem at 34, citing Matter of Hynes v Tomei, 92 NY2d 613, 627-629 [1998], cert denied 527 US 1015 [1999]). The language that plaintiffs seek to have severed is the clause in paragraph 11 (a) (2) which states “or at such other site as may be determined by the Nation in the event a site in the City of Buffalo is rejected by the Nation for any reason” (emphasis supplied).
Plaintiffs note that the Compact contains a severability clause (see Compact 1117 [b]). The State, however, contends that the severability clause applies only if provisions of the Compact are held invalid by a federal court (see State mem at 40-42).
Paragraph 17 (b) (1) of the Compact provides:
“Except for Paragraph 3, if any Paragraph or provision of this Compact is held invalid by a federal court, or its application to a particular activity is held invalid, it is the intent of the Parties that the remaining Paragraphs and provisions, and the remaining applications of such Paragraphs and provisions, shall remain in full force and effect.” (Compact 1117 [b] [l].)[15]
Plaintiffs assert that the second contingency, where the application of the Compact “to a particular activity is held invalid,” applies here, to permit the court to sever from the Compact the language in paragraph 11 (a) (2) cited above, and uphold the force and effect of the remainder of the Compact.
“Tribal-state gaming compacts are agreements, not legislation, and are interpreted as contracts” (Matter of Herald Co., Inc. v Feurstein, 3 Misc 3d 885, 891 [Sup Ct, NY County 2004], citing Texas v New Mexico, 482 US 124, 128 [1987] [other citations omitted]). With respect to severability of contracts, “whether the provisions of a contract are severable depends largely upon the intent of the parties as reflected in the language they employ and the particular circumstantial milieu *686 in which the agreement came into being” (Matter of Wilson, 50 NY2d 59, 65 [1980]; see Christian v Christian, 42 NY2d 63, 73 [1977] [“by expressly stipulating that if any provision of the separation agreement be held invalid or unenforceable all other (s) shall nevertheless continue in full force” the parties made the agreement “within reasonable limits divisible, and there is little room for construction”]).
Given the existence of an applicable severability clause, the court finds that the parties have expressed their intent to be bound by the remaining provisions of the Compact, in the event of the invalidation of a particular clause. This determination is buttressed by the presence of an exception for paragraph 3, the provision prescribing the types of gaming the Seneca Nation can conduct; in other words, all other provisions may be severed.
Practically speaking, given the language of the MOU that the Erie County casino would be located in the City of Buffalo, the enabling legislation requiring that any compact be “consistent with” that MOU, and the incorporation of the MOU into the compact, the court finds sufficient evidence that it was the intention of the parties to treat the compact as severable under circumstances such as the present. The court notes further that, contrary to the State’s contention, the court is not “reforming” the Compact (see generally Chimart Assoc. v Paul, 66 NY2d 570, 573-574 [1986]).
Accordingly, the court severs from the Compact so much of paragraph 11 (a) (2) as recites “or at such other site as may be determined by the Nation in the event a site in the City of Buffalo is rejected by the Nation for any reason.” Such provision is deemed null and void. With the exception of that portion of paragraph 11 (a) (2) severed by the court, the Compact and its remaining provisions remain in full force and effect.
IX. Relief Against Uniland and the Town
Both Uniland and the Town of Cheektowaga assert that they are entitled to summary judgment because plaintiffs have failed to state a claim for relief against them (see Uniland mem at 4-14; Town mem at 15). Plaintiffs respond by asserting that, under section 123-b (2), they may “join as a party defendant the recipient or intended recipient of’ the allegedly wrongful state expenditures (see State Finance Law § 123-b [2]). The record clearly establishes that, if the Erie County casino were to be located in the Town of Cheektowaga, both Uniland and the Town would be the recipient of state funds under the terms of the MOU (Executive Law § 12; State Finance Law § 99-h), as well *687 as the Compact itself. The court agrees that both Uniland and the Town are necessary parties in this action who must be joined in order to afford complete relief (see CPLR 1001 [a]).
Additionally, in light of declaratory and injunctive relief granted by the court against the State, to ensure the maintenance of the status quo and the effectiveness of the relief granted, the court must enjoin any sale or transfer by Uniland of the Cheektowaga property at issue to the Seneca Nation incident to or for the purpose of development, construction, or establishment of said land, including any improvements thereon, as a class III gaming facility.
Thus, equitable relief is available against both Uniland and the Town for the reasons cited above.
X. Attorney Fees
Plaintiffs contend that they have a right to recover their costs and attorney fees in this citizen-taxpayer action, based upon settled common-law principles that a taxpayer who succeeds in challenging illegal action has conferred a benefit upon other taxpayers similarly situated and is entitled to recoup counsel fees expended by the litigating taxpayer out of a fund created by the recovery (see plaintiffs’ mem at 37; reply mem at 60-62; see generally Gerzof v Sweeney, 22 NY2d 297, 308 [1968]; Nance v Town of Oyster Bay, 54 Misc 2d 274, 275 [Sup Ct, Nassau County 1967], affd 30 AD2d 918 [2d Dept 1968]).
However, plaintiffs obtained standing in this action under State Finance Law § 123-b, enacted after the case law cited above. One provision of the article of the State Finance Law relating to citizen-taxpayer suits, section 123-g, grants authority to the court to “fix a reasonable sum to reimburse [plaintiffs] for costs and expenses, including attorney fees in an action wherein judgment was rendered” for the plaintiffs (State Finance Law § 123-g [1]). However, “[s]uch attorney fees shall only be paid from the fund established under section [123-h] of this article to the extent of the money available therein” (id.). Section 123-h was repealed in 1999 (see L 1999, ch 405, part F, § 27, eff Aug. 6, 1999, deemed eff Apr. 1, 1999). Section 123-g, however, remains in effect. Thus, no fund is available from which to reimburse plaintiffs for their attorney fees. Plaintiffs, therefore, are not entitled to an award of attorney fees. As prevailing party, however, plaintiffs are entitled to an award of statutory costs, consistent with the provisions of the CPLR.
*688 Declaratory and Injunctive Relief
The court hereby grants summary judgment to plaintiffs, granting the declaratory and injunctive relief set forth below. The court denies all of the cross motions for summary judgment by defendants. The court awards to plaintiffs the following declaratory and injunctive relief:
1. The court declares that, that portion of paragraph 11 (a) (2) of the August 18, 2002 Nation-State Gaming Compact between the State of New York and the Seneca Nation of Indians, which recites “or at such other site as may be determined by the Nation in the event a site in the City of Buffalo is rejected by the Nation for any reason,” is unconstitutional, pursuant to New York State Constitution, article III, § 1, as violative of the principle of separation of powers, and is therefore declared null and void, and is hereby severed from the August 18, 2002 Compact between the State of New York and the Seneca Nation of Indians.
2. The court determines that the Honorable George E. Pataki, Governor of the State of New York, and the State of New York, are permanently enjoined and restrained from engaging in any state action or activity of any nature that seeks to or has the effect of enforcing so much of the provisions of paragraph 11 (a) (2) of the August 18, 2002 Compact between the State of New York and the Seneca Nation of Indians which the court has declared unconstitutional, null and void and severed from the Compact.
3. The court determines that the Honorable George E. Pataki, Governor of the State of New York, in connection with that portion of paragraph 11 (a) (2) declared unconstitutional, is permanently enjoined and restrained from issuing any executive order, unilaterally amending the August 18, 2002 Compact, or entering into any contractual agreement with the Seneca Nation or its affiliates, which authorizes the Seneca Nation of Indians to locate a class III gaming casino in the Town of Cheektowaga or in any town, village, or city in the County of Erie other than the City of Buffalo.
4. The court declares that the appropriation, disbursement, utilization, or expenditure, whether by loan, grant, bond or otherwise, of any New York State funds by the Honorable George E. Pataki or the State of New York for any purpose or activity of any nature arising out of or relating to the development, construction or establishment of a class III gaming casino in the Town of Cheektowaga, New York, or any other town, vil *689 lage or city in Erie County other than the City of Buffalo, is declared unconstitutional under article III, § 1 of the New York Constitution.
5. The Honorable George E. Pataki and the State of New York are permanently enjoined and restrained from the appropriation, disbursement, utilization, or expenditure, whether by loan, grant, bond or otherwise, of any state funds to the Seneca Nation of Indians or its affiliates, the Town of Cheektowaga, Uni-land Partnership, L.E, now known as the Uniland Partnership of Delaware L.P., doing business as Uniland Development Company, or any other person or entity for the purpose of conducting any assessment, study, land acquisition, attainment of site control, eminent domain proceeding, development, construction, or any other activity of any nature arising out of or relating to the development, construction, or establishment of a class III gaming casino in the Town of Cheektowaga, New York, or in any other town, village, or city in Erie County other than the City of Buffalo.
6. The Town of Cheektowaga, New York, and the Uniland Partnership, L.E, now known as the Uniland Partnership of Delaware L.E, doing business as Uniland Development Company, are permanently enjoined and restrained from directly or indirectly accepting, utilizing, expending or disbursing any New York State funds appropriated, disbursed, or expended by the Honorable George E. Pataki or the State of New York, if any, in the possession of or which may come into the possession of the Town of Cheektowaga and/or Uniland, in connection with any assessment, study, land acquisition, attainment of site control, eminent domain proceeding, development, construction, or any other activity of any nature arising out of or relating to the development, construction, or establishment of a class III gaming casino in the Town of Cheektowaga, New York, or in any other town, village, or city in Erie County other than the City of Buffalo.
7. Uniland Partnership, L.P., now known as the Uniland Partnership of Delaware L.P., doing business as Uniland Development Company, is permanently restrained and enjoined from entering into any contractual agreement with the Seneca Nation of Indians, the Seneca Gaming Corporation, or their affiliates, for the sale or transfer to the Seneca Nation, the Seneca Gaming Corporation or their affiliates, of 57.1 acres of land presently owned by Uniland in the Town of Cheektowaga, New York, which sale or transfer of land is incident to or for the *690 purpose of the development, construction or establishment of said lands, including any improvements thereon, as a class III gaming casino.
8. The application by plaintiffs for an award of attorney fees against defendants pursuant to State Finance Law § 123-g or under the common law be, and the same is hereby, denied.
9. With respect to the injunctive relief granted herein, such relief is subject to future action of the New York State Legislature through amendment of Executive Law § 12 or other enabling legislation, consistent with article III, § 1 of the New York State Constitution.

. Restricted fee status means that the lands cannot be sold or alienated by the tribe or Nation for a certain period without approval by the United States (see generally United States v Ramsey, 271 US 467, 470 [1926] [defining trust patent/allotment and restricted fee allotment]).

. Whether the conduct of class III gaming in Erie County meets the requirements of 25 USC § 2710 (d) (1) (B) is not at issue in this action. Similarly, the court is not required to address the constitutionality of class III casino gaming under article I, § 9 of the New York Constitution. In denying a motion to intervene filed by Daniel T. Warren, the court passed upon the opportunity to rule on the issue whether casino gaming violates article I, § 9. The court notes that similar issues have been raised and decided by the Supreme Court in Albany County in the cases of Dalton v Pataki and Karr v Pataki (July 17, 2003, Teresi, J., Index Nos. 718-719/02), which cases are currently pending on appeal before the Appellate Division, Third Department.

. The MOU defines “compact” to mean “the Nation-State Compact to be negotiated between the State and the Nation pursuant to the terms agreed herein” (MOU at 1 n 1 [emphasis supplied]).

. A third casino was authorized on “current reservation territory” (MOU at 2). That facility is not at issue in this action.

. See Saratoga Chamber of Commerce v Pataki, 275 AD2d 145, 154-155 (3d Dept 2000) (Saratoga I) (finding standing for plaintiffs therein to challenge Governor’s authority to enter into compact with Mohawk Tribe), appeal after remand 293 AD2d 20 (3d Dept 2002) (Saratoga II), affd as modified 100 NY2d 801 (2003) (Saratoga III), cert denied 540 US 1017 (2003).

. Section 3 of chapter 383, part B, enacting State Finance Law § 99-h, provides for a fund to reimburse host municipalities for the costs of hosting the casinos. For any gaming facility “located in the county of Erie or Niagara, the municipal governments hosting the facility shall collectively receive a minimum of twenty-five percent of the negotiated percentage of the net drop from electronic gaming devices the state receives pursuant to the compact” (see State Finance Law § 99-h [3]).

. No party has objected to the admission of this document in evidence, for all purposes.

. As noted, the statute provides for several exceptions to the prohibition of gaming on lands acquired by the Secretary “in trust for the benefit of an Indian tribe” (25 USC § 2719 [a]) after October 17, 1988 (see 25 USC § 2719 [b]). One of the exceptions is when lands are taken into trust as part of a settlement of a land claim (see § 2719 [b] [1] [B] [i]).

. Although the Court of Appeals denied leave in Kennedy v Novello, it is noteworthy that, despite denying the plaintiffs standing to sue, the Third Department reached the merits of that case and ruled against the plaintiffs, leaving the challenged agency rulings untouched (see 299 AD2d at 607). Given that the Third Department reached the merits of the case and ruled, the denial of leave to appeal from that ruling by the Court of Appeals cannot be interpreted as an approval of the Third Department’s decision on standing.

. Federal courts have agreed that the location of a casino within a particular state municipality is an important policy choice (see Wisconsin Winnebago Nation v Thompson, 824 F Supp 167 [WD Wis 1993] [geographic location of class III gaming facility is a state policy choice properly the subject of a Tribal-State compact], affd 22 F3d 719 [1994]).

. The MOU recites the host municipalities’ share of state revenues. This is reflected in the Compact to the extent that the MOU is incorporated by reference therein. Additionally, State Finance Law § 99-h defines the reimbursement of expenses by the State to the host municipality.

. The Merriam-Webster Online Dictionary (<www.merriam-webster.com> [2004]) defines footnote as: “1: a note of reference, explanation, or comment usually placed below the text on a printed page 2: something that is suhordinately related to a larger event or work.”

. The term “to propose” is defined by the Oxford English Dictionary as “[t]o put forward or present for consideration, discussion, solution, imitation or other treatment; to put before the mind, call to one’s notice, call attention to; to set forth, state, propound” (see also Black’s Law Dictionary 1219 [6th ed] [a proposal is “(a)n offer; something proffered. An offer, by one person to another, of terms and conditions with reference to some work or undertaking, or for the transfer of property, the acceptance whereof will make a contract between them. Signification by one person to another of his willingness to enter into a contract with him on the terms specified in the offer”]).

. The court does not view the resolution of this issue as interpretation of a missing provision of the MOU as a matter of fact. Instead, the issue is one of interpretation of the contract as a matter of law. The court’s analysis and resolution of this issue rests solely upon the court’s interpretation of IGRA, the necessary state and federal approval processes, and of the relevant court decisions which have addressed the state and federal approvals necessary to authorize the establishment of a class III gaming facility.

. Paragraph 3, the exception to the severability clause, provides that the Nation “shall conduct only those class III Gaming games specifically Usted” in an appendix (Compact 11 3).